# Hoover v. McCormick.

(Decided February 2, 1923.)

## Appeal from Daviess Circuit Court.

1. **Physicians and Surgeons—Degree of Skill and Care Required.**—It is the duty of physicians and surgeons when employed to treat a patient to exercise that degree of care, skill and attention in both diagnosing and treating the case as is usually exercised by others similarly engaged in similar communities, which means the community where the defendant is located and where he maintains his office, and not where he actually performs the services for which he is called.

2. **Witnesses—Fact Showing Bias.**—It is competent to show by a witness any fact bearing on his interest and tending to show his bias in the case for the purpose of affecting his credibility.

3. **Physicians and Surgeons—Degree of Skill and Care Required.**—It is not error in an instruction to require of a physician in a malpractice suit, the exercise of the care as above defined according to "the exigencies of the case," since that expression is tantamount to "the necessities of the case," and the rule requires him to exercise ordinary care and diligence to discover such necessities or exigencies and to shape his conduct accordingly within the limits of the rule defining his duty.

BIRKHEAD & WILSON and W. P. SANDIDGE for appellant.

CLEMENTS & CLEMENTS and BEN D. RINGO for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

In the course of this opinion we shall employ terms likely to be more easily comprehended and understood by the layman rather than the correct anatomical ones employed by the physician witnesses.

On March 29, 1918, plaintiff and appellee here, W. B. McCormick, sustained a simple backward dislocation of his right elbow joint. It happened about twelve miles from the city of Owensboro and he called the defendant and appellant, J. C. Hoover, a practicing surgeon located at Owensboro, to take charge of the case and to render such services as he, in the exercise of the required care, determined were necessary. The tendered employment was accepted and defendant arrived at plaintiff's home within three-quarters of an hour, or at the outside one hour and a quarter. A hurried examination made by defendant and plaintiff's regular local physician, who was inexperienced in the practice of surgery, suggested the necessity of administering an anaesthetic in order to

relax the muscles so as to facilitate the reduction of the dislocation as well as to relieve the patient of the incidental pain of the operation. The reduction was thought to be made and plaintiff's arm was adjusted in a sling at about a right angle with bandages around the injured parts encased in a steel splint fitting on the outside of the elbow joint. That occurred on Friday morning and defendant left instructions for plaintiff to come to his office in Owensboro on the following Monday morning, which was done. According to defendant and the country physician who assisted him, defendant's arm on that morning was considerably swoolen, so much so that on the day previous the country physician clipped some of the bandages, and which was done under instructions from defendant. In addition to the swelling at that time there were scattering blisters on the arm for some distance above and below the elbow. The arm was bathed and antiseptics were used and it was redressed and left in the same position. Plaintiff continued to visit defendant at intervals of two or three days, which was according to the latter's direction, upon each of which occasions the arm was similarly treated, but at none of them was there any effort made, either by manipulation or X-ray photograph, to determine whether there was either a fracture of any kind or whether the dislocation had been reduced. Somewhere about the 13th of April plaintiff was called to Louisville to see his mother who was confined in a hospital located therein, and after consulting defendant the latter agreed that the trip might be made, and his mother died in the hospital about the 28th of April. After arriving in Louisville he stayed with his mother the greater part of each day, but not at night. About the 25th of April, plaintiff's arm was so painful that he consulted the physician who was attending his mother, by whom he was informed of the necessity of treatment to his arm, and he called defendant from Louisville over the telephone and got his permission to have it done. But before doing so an X-ray photograph was made of the joint and it plainly developed that the dislocation was not reduced, and it was further developed that there was no fracture of any of the bones. Within a day or so plaintiff returned to Owensboro and exhibited to defendant that photograph, which was on a Saturday, and defendant agreed that the arm should at once be reduced on the following Monday, it being the 29th of April, just one month after the sustaining of the injury. On that day an anaesthetic

was again administered to plaintiff and three physicians with a nurse manipulated the arm and resorted to and applied the well recognized and known methods usually employed to produce reduction by that method, but without success. The arm was again dressed and plaintiff was told by defendant to report at stated times, but whether he was notified by defendant of the failure to effect a reduction is a disputed issue; defendant testified that he so informed plaintiff, while the latter denied the statement. But, whether so or not, defendant testified that he postponed the performance of a surgical operation to bring about the reduction, which he and all of the physician witnesses who testified in the case say was the only remaining remedy, because of the effects of the manipulation. Somewhere about the latter part of the first week in May, or the first part of the second week, and after defendant had again seen the arm, he left Owensboro, visiting Dawson Springs for a few days and went from there to Rochester, Minnesota, to obtain instructions in a sanitarium, where he remained until the early part of June following. In the meantime, and on the 13th day of May, after plaintiff had learned of defendant's departure, he went to Louisville in company with his cousin, Dr. E. B. McCormick, who is a physician and surgeon in Owensboro, and there had another X-ray picture made of his elbow joint which showed the same dislocation as appeared in the first picture. In the meantime a similar picture had been made in Owensboro, but not by or at the instance of defendant, and it was made on the eve of the departure for Louisville. At the latter place Dr. G. A. Hendon performed an operation on plaintiff's injured arm by making an incision extending about three inches below, and the same distance above, the joint and, of course, discovered the dislocation, and after separating the ligaments and muscles from the dislocated bones, to which nature had adhered them, the bones were attempted to be adjusted in their natural place, but owing to the contraction of the muscles of the arm surrounding the parts it was impossible to do so and about one-half inch of the single bone in the upper part of the arm had to be, and was, taken off. The shortened end was then put in the natural socket, after removing therefrom deposits made by nature, and the arm was dressed and eventually healed, but in such a manner as to leave plaintiff with but little motion in the joint, and with partially paralyzed fingers, all of which results are explained by

the physician witnesses as. being the natural and probable consequences of such a delayed and necessitated operation. At. this point it might be well to state that neither defendant, nor any other professional witness in the case, criticised the operation performed by Dr. Hendon, but on the contrary a number of them stated that it was the only thing to be done at that time and no fault was found by any of them with the manner of its performance.

This action was brought by plaintiff against defendant to recover damages for the latter's neglect and failure to exercise the proper care in diagnosing and treating the injury, which were placed in the petition at $10,-000.00. about $1,750.00 of which was alleged to be due for loss of time and extra expense as a result of defendant's negligence; the remaining portion was asked on. the ground of mental and physical pain and suffering and permanent loss of power to earn money. A denial of the allegations of the petition formed the issues, there being no claim of contributory negligence. On the trial there was a verdict in favor of plaintiff for $4,000.00, which the court declined to set aside on a motion made for the purpose, and this appeal is prosecuted from the judgment rendered thereon.

Three alleged errors are argued in brief of learned counsel, which are: (1), the evidence is. insufficient to. sustain the verdict and it is, therefore, flagrantly against the evidence; (2), error in the admission of testimony introduced by plaintiff over the objections of defendant, and (3), error in the .instructions; each of which we will briefly consider in the order named.

1. In addition to what has already been stated, defendant claims. that he was not negligent in failing to properly diagnose .the case, or in failing. to reduce the dislocation on his first visit, because when he arrived there was so much swelling in the parts as to destroy the landmarks by which to guide him in making the diagnosis as well as to aid him in determining whether the dislocation was reduced. If the fact (the existence of the swelling), upon which this contention was made was true, there .is evidence from defendant and a. number of his witnesses to show that such a condition would create an impediment to a proper examination, as well as a proper adjustment, though according to some of the testimony such condition is not necessarily so obstructive; but plaintiff and several witnesses who were present testi-

fied that no such swollen condition existed at the time defendant arrived, and there is professional testimony in the case that such a condition of the particular joint involved was improbable after so short a time. So that, the excusing fact relied on by defendant is sharply contradicted by the evidence and, necessarily, formed an issue for the determination of the jury.

Defendant also contends in his testimony, which is likewise supported by the greater number, if not all, of his professional witnesses, that he was excusable for not attempting a reduction of the arm, as well as from not making an X-ray picture of it, on the following Monday morning because of the condition of the arm at that time, though he does not contend that the taking of an X-ray picture would produce any harmful results, but merely insists that no good could come from it, except that of informing him of the true condition, he believing at the time, and not knowing to the contrary, that the dislocation was reduced. There is some professional testimony in the case that good practice would require a manipulation of the arm, even under those conditions, and all of the witnesses who testified on the point stated that it would have been good practice to have taken the picture at that time in order to develop the true conditions, and to thereafter treat the case with a view of reducing the dislocation at the earliest possible moment so as to forestall the processes of nature which might render the final result hazardous. Defendant contended in his testimony that the proper practice was to dissipate the then condition of the arm and after that to administer the proper treatment, which he said he intended to do when the arm got in proper condition, and which time, according to the testimony of plaintiff, was fixed at about ten days from the last visit before plaintiff went to Louisville. As is usual in such cases, there was a contrariety of testimony upon all of the direct as well as collateral issues, but one can not read the record without being forced to the conclusion that defendant was negligent in at least the one particular in not sooner making an X-ray picture of the elbow so as to better enable him to treat it thereafter. We might also add that the evidence is likewise contradictory as to whether defendant properly (within the rule measuring his duty), diagnosed or treated the case on the first visit. To say the least of it the contradictions in the testimony upon the crucial points clearly made a case for the determination of the jury, and under the prevail-

ing rule of practice it can not be said that the verdict is flagrantly against the evidence, which fact forces us to overrule this contention and without considering the abandonment of the case, which fact is also relied on by plaintiff as constituting negligence.

2. The erroneous evidence complained of under this ground was elicited on the cross-examination of Dr. Abell, a witness for defendant. It appeared that both the witness and defendant were members of the State Medical Association, and the former was asked, "Has that organization an arrangement among you doctors belonging to it, by which the organization as such protects you against malpractice suits?" The question was objected to, and the witness said to the court, "I would be glad to answer that if the honorable court will permit me." The court instructed him to answer and the witness said: "We have not exactly what your words imply. We have a defense branch which is obliged to investigate malpractice suits. Where the malpractice suits are not based on proper foundation, assistance is given in so far as legal advice is concerned." The answer was not objected to, nor was any motion made to exclude it, but it was shown by defendant that he had neither asked for nor obtained any assistance from the association to which he belonged in the way of procuring counsel or otherwise. The witness testified that he lived in Louisville and that he came to the trial without being summoned, and his testimony was intelligent and eminently fair, some parts of which were as much against defendant as in his favor.

It is everywhere recognized and the practice universally applied that it is proper to prove by a witness on cross-examination any facts tending to show bias or interest which might possibly affect the credibility of his testimony. In the case of the Lack Malleable Iron Co. v. Graham, 147 Ky. 161, it was held that it was competent to prove by a physician witness "the amount of his bill and whether or not it has been paid, for the purpose of showing bias and affecting his credibility upon this point." The point involved here is not exactly the same as the one involved in that case, but it was developed that defendant and the witness were members of the same organization and each necessarily contributed to the fund inquired about, the existence as well as the purpose of which was admitted. It is, therefore, extremely probable that the testimony was competent for the purposes

stated, especially in view of the fact that other testimony of the witness showed his interest in the case. But whether so or not, and admitting for the purposes of this opinion that it was technically an error to admit it, we are then convinced that it was not sufficiently prejudicial to authorize a reversal of the judgment upon that error alone, since the jury were afterwards told that defendant obtained no assistance from that source but was contesting the action with only his own resources.

3. The principal criticism of the instructions is directed at number 1, given by the court, which said:

"The court instructs the jury that if they believe from the evidence that the defendant, after the plaintiff engaged his professional services to treat his injured arm, failed to exercise ordinary care and skill in such treatment as the exigencies of the case required; or to use such ordinary proper treatment as the defendant might have discovered to have been necessary by the use of ordinary care and skill in the examination of the injured arm, and that by reason of such lack of ordinary care and skill upon the part of the defendant, if any, plaintiff has been damaged, then the law is for the plaintiff and you will so find."

The objection is directed to the language contained therein, "as the exigencies of the case required; or to use such ordinary *proper* treatment as the defendant might have discovered to have been necessary by the use of ordinary care and skill in the examination of the injured arm," and in support thereof we are cited to the case of Dorris v. Warford, 124 Ky. 768, which was also a malpractice case. Instruction number 1 in that case, and which is copied in the opinion, contains almost the verbatim language criticised in this case. There was a judgment therein in favor of plaintiff for the sum of $1,000.00, which was reversed by this court, not because of the criticised language contained therein, but because of the error in stating and submitting the rule for the measurement of damages should the jury return a verdict in favor of plaintiff. It is true that in the latter part of that opinion the court expressed disapprobation of the quoted language and directed that it be omitted from the instruction on another trial, but upon what ground that was done the opinion is silent, and we must confess our inability to discover one, unless it was because of the special facts of the case. Counsel attempts to sustain it on the ground that the language contained an expression

from the court that it was his opinion there existed *exigencies* in this case and that the jury probably so understood it. We do not so construe the language, but if it was susceptible to such construction the testimony, as given by defendant, indisputably showed that the case was *exigent,* and he bases his defense upon that very reason. Therefore, the language might possibly been inappropriate under the facts of the Dorris case and not so under the facts of this case.

The rule is well settled, and it has often been declared by this court ''that a physician or surgeon is answerable for an injury to his patient resulting from want of the requisite knowledge and skill, or from the omission to use reasonable care and diligence in the treatment of the patient, or to exercise such care and diligence to discover the patient's malady (to make a proper diagnosis). . . . It is quite generally agreed that he is bound to bestow such reasonable and ordinary care, skill and diligence as physicians and surgeons in similar neighborhoods and surroundings engaged in the same general line of practice ordinarily have and exercise in like cases.'' Stevenson v. Yates, 183 Ky. 208. Other domestic cases are: Burke v. Foster, 114 Ky. 20; Barnett's Admr. v. Brand, 165 Ky. 616, and Vanmeter v. Crews, 149 Ky. 335.

The same rule, defined in practically the same language, is applied by the courts generally as is shown by the text in 21 R. C. L., beginning on page 387, which says: ''To make a properly skillful and careful diagnosis of the trouble of a patient is one of the fundamental duties of a physician, and if he fails to bring to that diagnosis the proper degree of skill or care he must answer to the patient for the damages thus caused just as readily as he must answer for the application of improper treatment. After a diagnosis, the practitioner must be duly careful in his treatment of the case, but the propriety of his action in prescribing a certain remedy or operation is to be determined by reference to pertinent facts then in existence which were or ought to have been known in the exercise of due care, and not by reference to knowledge later acquired.'' On page 390 of the same volume it is said that, ''It is his (the physician's) duty to give the patient such attention after the operation as the necessity of the case demands, in the absence of any special agreement limiting the service or reasonable notice to the patient.'' Supporting the text are many cases cited in

the note to the case of Gillette v. Tucker, 93 Am. St. Rep. on page 666, the case being reported on page 639.

We, therefore, conclude that, though under the facts of some cases, the language objected to herein might be inappropriate or even erroneous, yet under the facts of this case it was neither objectionable nor erroneous, but correctly stated the rule under the facts presented. Indeed, "the exigencies of the case" can scarcely be distinguished from "the necessities of the case," but if there should exist a technical difference between the two expressions we are sure that such difference was not observable by, or in anywise influenced the jury in returning its verdict.

Moreover, as we have seen, Judge Hobson, who wrote the opinion for the court in the Dorris case, evidently considered the criticised language, not as embodying a fatal error to the instruction, but only as surplusage, and by his criticism intended thereby to polish it so as to eliminate from it all unnecessary surplusage; for it will be observed that he nowhere intimated in the opinion that the use of the language would be sufficient to authorize a reversal, since he studiously refrained from saying so. Again, when he came to write his excellent work on Instructions to Juries, he quoted in its section 484 instruction number 1, given in that case, as modified with reference to the correct measurement of damages, as the proper one to be given in cases like this, and without excluding therefrom the language criticised in the opinion and objected to in this case.

In view of the authorities referred to and the facts in the case, as we have pointed out, we are unable to agree with learned counsel in his criticisms of instruction number 1 urged under this ground. Other criticisms of the instructions are clearly untenable; one of them is that the court erred in using the word "proper" as applied to the treatment administered; but the authorities above cited, in defining the physician's duty, contain that element, which does not mean that the treatment shall actually be proper in all respects, but only that it shall be proper as measured by the defined degree of skill and care required in such cases, which, as we have seen, is that usually and ordinarily possessed by others engaged in the same profession in the same locality, and which locality is not the place where the services are rendered, but the place where the defendant is stationed and lo-

cated and where he engages in the practice of his profession.

After a careful study of the case we have been unable to discover any error prejudicial to the substantial rights of the defendant and the judgment is accordingly affirmed.