IVAN FAY BARTHOLOMEW, by ELSIE LINN, his next friend, Appellant, v. J. H. BUTTS et al., Appellees.

No. 45597.

AUGUST 11, 1942.

REHEARING DENIED NOVEMBER 20, 1942.

Robert Buckmaster, of Waterloo, for appellant.

McCoy & Beecher and Reed & Beers, all of Waterloo, for appellees.

GARFIELD, J.—▇ Plaintiff, a 9-year-old boy, broke his right arm above the elbow. Doctors called it a supracondylar fracture. The injury occurred on Saturday, August 21, 1937, about 5:30 p. m. Plaintiff was promptly taken to a Waterloo hospital where the arm was set by Dr. Seibert and a Dr. Dunkel-

berg. The right hand was placed against the right shoulder, the forearm against the upper arm, and held in that position of acute flexion by tape applied to the arm and body. Ivan's mother testified "it was done up awful sharp." She further testified: "* * * Dr. Seibert * * * said he didn't have a jagged break; that it would set all right; that he would be all right, there wasn't anything to worry about." The next day, Sunday, the boy was returned to his home from the hospital. The parents asked Dr. Seibert about future treatment and the doctor said to bring the boy to his office only if the arm hurt or bothered him. It is not claimed the fracture was not properly reduced, but complaint is made of the subsequent treatment.

The boy was kept quiet at home for the next few days, with his arm in the same position of acute flexion in which Dr. Seibert had placed it. The following Thursday evening he complained that his arm hurt him. The next morning, Friday, his arm and hand were swollen and puffed so that the tape was cutting into his flesh until it bled, his fingernails were blue, "his elbow was swollen up as big as his knee." His mother took him right to Dr. Seibert's office. All the doctor did was to apply more tape to hold the arm in place and direct the mother "to take Ivan home and put ice packs on his arm *for three days*, and keep him in bed." These directions were followed but the arm did not improve.

On the following Tuesday, ten days after the injury and after ice packs had been applied for three days as directed, the boy was returned to the doctor's office, when an X-ray was taken. The tape was cut so that the hand could be lowered about two inches. No tape was removed but more was added. Dr. Seibert told the mother on this visit "that Ivan had a slight contracture. He said that there was nothing much that a person could do, just let it heal, and wait until the swelling went down." For three to four weeks more the boy was taken to the doctor's office about twice a week. The mother, the step-father, and Ivan, all testified the tape was never removed nor loosened from the arm during this period of five weeks following the fracture and no other treatment was applied except that more tape was added on nearly every visit.

Finally, five weeks after the fracture, Dr. Seibert for the

first time removed the tape that had held the arm in acute flexion. When the tape was taken off much of the skin and flesh came off with the bandage; "great gobs of pus was laying there on the tape, and his arm was just one mass of it." Dr. Seibert "took some gauze and cleaned it off the worst of it, and told [the mother] to take Ivan home and wash it off with soap and water." The doctor put no dressing on the arm at this time. Before the tape was removed, "Ivan's hand began to take funny shape, didn't look like a hand, began to draw down, * * * and some of his nails came off." The mother asked Dr. Seibert about this condition and was told that the boy would have to go to the University Hospital at Iowa City "for a little correction." It was not until January that the sores caused by the bandages healed so that Ivan could be taken to Iowa City.

On January 13, 1938, the boy was taken to the University Hospital, where he stayed for six months. An operation was performed. Before the trial in May 1940, Ivan had returned to the University Hospital nine more times, once for four months, again for three months, for five weeks, and for shorter periods. Three serious operations were performed on these visits to Iowa City. At times he suffered great pain. Constantly, day and night, for more than two years prior to the trial, he wore a brace or corrective apparatus except when his arm was in a cast or being operated on. "Ivan cannot do very much of anything. He is just like he was when he was a baby for me to take care of. Have to bathe him, and spread his bread, and cut his meat."

This suit was brought against Dr. Seibert and his partner, Dr. Butts, claiming that plaintiff's permanently deformed arm and hand were caused by negligent treatment of Dr. Seibert. At the close of plaintiff's evidence, defendants moved for a directed verdict because the evidence was insufficient to prove either negligence or proximate cause. The court sustained the motion and plaintiff has appealed. The principal matter before us is whether the record presents a jury question on negligence and proximate cause.

Upon the trial appellees conceded that appellant was then

suffering from a deformity known as Volkmann's contracture. This is a condition in which muscles of the forearm are lost to further use and are replaced by fibrous tissue, resulting in a permanent deformity sometimes called a claw hand. Appellees say in argument, "It is undisputed * * * that a Volkmann's contracture is caused by a circulatory obstruction."

 The standard of care required of a physician is well settled. He is bound to use that degree of knowledge, skill, care, and attention ordinarily exercised by physicians under like circumstances and in like localities. He does not impliedly guarantee results. Nelson v. Sandell, 202 Iowa 109, 111, 209 N. W. 440, 441, 46 A. L. R. 1447, and citations; Wilcox v. Crumpton, 219 Iowa 389, 393, 258 N. W. 704; Kirchner v. Dorsey & Dorsey, 226 Iowa 283, 294, 284 N. W. 171; 41 Am. Jur. 200, section 82.

Appellant is entitled to the most favorable construction of which the evidence is fairly susceptible. Degelau v. Wight, 114 Iowa 52, 53, 86 N. W. 36; Kopecky v. Hasek Bros., 180 Iowa 45, 49, 162 N. W. 828. In considering the sufficiency of the evidence in malpractice cases, other courts have commented on the natural reluctance of physicians to testify against a fellow doctor, especially one who is reputable. Christie v. Callahan, App. D. C., 124 F. 2d 825, 828; Stockham v. Hall, 145 Kan. 291, 293, 65 P. 2d 348, 349; Tadlock v. Lloyd, 65 Colo. 40, 44, 173 P. 200, 202; Johnson v. Winston et al., 68 Neb. 425, 430, 94 N. W. 607, 609. See 27 Iowa L. Rev. 659, 660. Ordinarily, evidence of the requisite skill and care exercised by a physician must be given by experts. 41 Am. Jur. 240, section 129; Whetstine v. Moravec, 228 Iowa 352, 370, 291 N. W. 425.

It is appellant's theory that when his arm and hand became swollen, the exercise of reasonable care required Dr. Seibert to remove, or at least loosen, the bandage, or widen the acute angle of flexion in which the arm was held; that the doctor's failure so to do was negligence, which was the proximate cause of Ivan's deformity. We hold there was substantial evidence to support appellant's theory and that the case should have been submitted to the jury.

 The jury could have found from the evidence that

appellant was obviously in danger of suffering a Volkmann's contracture when he was taken to appellees' office on the Friday morning following the fracture. Dr. Smith testified: "The symptoms [of Volkmann's contracture] are puffing, swelling, blue fingernails, which would indicate the arterial blood supply is going down and not coming back." Dr. Powers testified, "swelling, puffed hand and blue fingernails" were symptoms of the Volkmann's contracture which followed. These are the symptoms which the undisputed evidence shows Ivan exhibited to the doctor on Friday morning.

The testimony shows the imperative need for prompt treatment when the above symptoms appear. The medical witnesses were substantially agreed that 48 hours after the circulation is obstructed is ordinarily about the maximum time that a Volkmann's contracture could result, with six hours about the minimum. Dr. Mooney testified: "It can be a permanent disability when it isn't taken care of right away; if it is taken care of right the first few hours, it as a rule will right itself. * * * the circulation need be obstructed for six to forty-eight hours to result in a Volkmann's Contracture." Dr. Smith testified the general practice in the community would require instructing "the patient to report immediately if there was any marked swelling of the extremity or change in color. * * * There is always the possibility of swelling, and change in the soft tissues, from disturbance of circulation, and if that change is going to take place, the doctor would want to know it immediately." Dr. Powers testified, "a few hours is the period the circulation need be obstructed to result in a Volkmann's Contracture." Dr. Thornton: "The circulation need not be obstructed possibly more than six hours to result in a Volkmann's Contracture. It could be longer."

The medical testimony to prove negligence upon which appellant most relies is that of Dr. Mooney of Parkersburg, a town between 25 and 30 miles from Waterloo. He was graduated from medicine at Vanderbilt University in 1920, with 18 months' interneship in New Orleans and Macon, Georgia, and a year at Mayo Clinic. He had practiced at Parkersburg 15 years. He testified that he knew the degree of skill and care

exercised by physicians in Waterloo and similar localities, knew the treatment used by Dr. Steindler at Iowa City, and by the Mayo Clinic, he had worked with ten different doctors in Waterloo. That Dr. Mooney was not disqualified from testifying merely because he did not live in Waterloo, see Kirchner v. Dorsey & Dorsey, supra, 226 Iowa 283, 294, 284 N. W. 171.

On the issue of negligence, Dr. Mooney testified:

"If in addition to the facts set out in the last question, the boy on Thursday evening, following the Saturday on which the fracture was reduced, complains of pain in his arm, and the hand becomes puffed, and the fingernails blue, and the elbow swollen approximately to the size of the boy's knee, and on the next morning, which is Friday, the boy is taken to the physician's office, and the arm is still in that condition, in my opinion, basing my opinion upon my knowledge of the ordinary skill, care and attention given by physicians in this locality and similar localities, well, the usual procedure there, and the standard practice would be to take it down, take that bandage loose * * * I think the standard method would be to release the bandage and look the thing over, and see what was wrong. I would say the standard in that case would be to take the arm loose, and re-X-ray it and see what was wrong, loosen the bandage, and change the degree of flexion, possibly extend it * * * I would take the arm loose, and X-ray it, and * * * try to remove the cause if possible."

Dr. Mooney was corroborated in part by Dr. Smith, whom appellees conceded is a qualified practitioner in Waterloo. The effect of part of his testimony is that ordinary practice required Dr. Seibert to widen the flexion in which the arm was held. When asked what was proper and average practice in the locality under the circumstances shown, Dr. Smith said:

"* * * they would probably alter his bandage sufficiently to lessen the acuteness of the flexion, and place the arm at rest, and probably apply ice or cold packs of some nature, in order to cut down on the swelling. * * * the recognized treatment, if the radial pulse is diminished any appreciable amount, or there is cyanosis, bluish discoloration of the hand, or marked

swelling, is to reduce the flexion, the acute flexion, to a point where the radial pulse becomes. somewhere near normal.'' (Italics ours.)

It is true, as appellees say, there is no evidence that appellant's radial pulse was taken. If it was not, according to Drs. Smith and Mooney, it should have been taken. But Dr. Smith said, in substance, that the flexion should have been widened if there was bluish discoloration of the hand or marked swelling, two symptoms which the boy showed Dr. Seibert on Friday morning.

With the above evidence that ordinary practice required the removal or loosening of the bandage or widening the angle of flexion, it appears .without dispute that the only treatment administered by appellees on Friday was to apply more tape to hold the arm in place, even though the original bandage was cutting into the flesh until it bled, and to direct the mother to apply ice packs *for three days*. By clear implication, if not expressly, Dr. Seibert told Ivan's mother it would not be necessary for him to see the boy until the end of the three-day period. On the following Tuesday, after applying ice packs for three days, the boy was next taken to the doctor, who then admitted ''that Ivan had a slight contracture. He said that there was nothing much that a person could do, just let it heal, and wait until the swelling went down.'' This is consistent with Dr. Mooney's testimony that ''it can be a permanent disability when it isn't taken care of right away,'' and with appellant's contention that it was then too late to remedy the condition by cutting the tape so that the hand could be lowered two inches.

With the need for prompt treatment of the recognized symptoms of Volkmann's contracture which Ivan showed the doctor on Friday, the jury could have found that Dr. Seibert should have seen the boy between Friday and the following Tuesday. On the frequency with which a physician should see a patient, see 41 Am. Jur. 215, section 100. Dr. Mooney testified:

''The next morning the child should be allowed to go home, and the arm checked at daily intervals for the next week, for

swelling, numbness, and things of that sort, any complications that might happen; that is the standard procedure.''

There is sufficient evidence not only that it was negligent for Dr. Seibert not to relieve the flexion in which the arm was held or remove or loosen the bandage, but that such failure was the proximate cause of this boy's unfortunate deformity.

As stated, it is conceded that a deformity such as appellant has is caused by an obstruction to the circulation. It is apparent that failure to loosen or remove a tight bandage holding a badly swollen arm at an acute angle could easily obstruct the circulation. But appellant was required to prove that the negligence relied upon was the probable cause of his deformity. Annotation 59 A. L. R. 884. The evidence must be such as to make appellant's theory reasonably probable—not merely possible— and more probable than any other theory based on such evidence. Ramberg v. Morgan, 209 Iowa 474, 482, 218 N. W. 492, and citations. It was not necessary, however, that the proof be conclusive nor exclude every other suggested cause or possible theory. Berg v. Willett, 212 Iowa 1109, 1114, 232 N. W. 821; Whetstine v. Moravec, supra, 228 Iowa 352, 364, 291 N. W. 425, and citations; Christie v. Callahan, supra, App. D. C., 124 F. 2d 825, 840; Lippold v. Kidd, 126 Or. 160, 269 P. 210, 59 A. L. R 875, 883, and Annotation 884, 890; 41 Am. Jur. 243, section 131.

The most direct medical testimony on proximate cause is Dr. Mooney's final answer on direct examination that ''if the bandages had been loosened and the arm extended, I don't think he would have had a Volkmann's contracture.'' Dr. Mooney had previously testified: ''* * * the probable causes in this particular case, * * * were either the flexion was too acute, or the bandages were too tight, or both, or * * * the bone might have slipped out of place.'' The following record was then made:

''Q. [by appellant] * * * explain what you mean by that [the bone slipping out of place], how that would cause the Volkmann's Contracture?

''Objected to * * * there is no allegation in the petition

touching that fact, therefore incompetent, irrelevant and immaterial.

"The Court: Sustained. Exception."

This ruling is one of the errors assigned by appellant. Appellees had brought out on cross-examination of Dr. Smith that slipping of the bone was a possible cause. Appellees say in argument, "We suspect that the real purpose of the question was to have the witness eliminate the slipping of the bones as a cause of the contracture." This is obviously what appellant was attempting to do and properly so. The court should have permitted the question to be answered.

Dr. Mooney also testified when asked about probable cause:

"* * * it is either too much flexion, or too tight bandages, or both, are the main reasons. There are several other reasons which might happen but those are the main reasons that I can see. * * * The two probable chief causes * * * in ninety-five per cent of the cases. There are possibilities, * * * that in the other five per cent of the cases it might be caused by something else."

It was suggested upon the trial that appellant's deformity might have been caused by the original fracture. The testimony shows, however, this is not probable because of the time that elapsed between the injury and the symptoms of the contracture. Dr. Mooney testified:

"If the Volkmann's Contracture resulted from the original injury, the symptoms would appear within two days. If the symptoms appear on Thursday following the reduction of the fracture on Saturday, in my opinion the resulting Volkmann's Contracture would not be referable to the original trauma. It would be referable to something that happened after that."

Dr. Smith testified:

"* * * it seems to me, if it was ten days after the original injury, and the arm had been in good shape up until that point, * * * the arm would not swell from the initial injury, but would be caused by some extrinsic condition as far as I know."

Dr. Thornton testified:

"If in addition to those facts, the angle of flexion is not reduced, the boy is sent home, and the swelling continues and a Volkmann's Contracture later becomes apparent, the cause of the Volkmann's Contracture in my opinion would be the swelling around the elbow joint."

Aside from appellant's theory of causation, the two principal possible causes suggested are the original fracture and slipping of the bone. Both possibilities were negatived sufficiently to make the issue of causation for the jury.

We have set out only testimony favorable to appellant. We express no opinion on the weight of the evidence nor do we suggest the conclusion to be reached therefrom. Those are functions of the jury to whom the case should have been submitted. See Whetstine v. Moravec, supra, 228 Iowa 352, 383, 291 N. W. 425; Degelau v. Wight, supra, 114 Iowa 52, 55, 86 N. W. 36. For a new trial, the case is—Reversed and remanded.

STIGER, SAGER, BLISS, and HALE, JJ., concur.