MALCOLM WILSON, appellant, v. WESTON CORBIN, appellee.

No. 47493.

(Reported in 41 N.W.2d 702)

MARCH 7, 1950.

Stuart & Stuart, of Chariton, for appellant.

R. E. Killmar, of Osceola, and Elton A. Johnston, of Corydon, for appellee.

GARFIELD, J.—This is another of the many cases that have reached us where there is a lack of compliance with rule 340, Rules of Civil Procedure, in preparing the record on appeal. The

rule contemplates that such record shall consist of an *abstract* of so much of the record in the trial court as is *material to the appeal.* Much in this record should have been omitted, including stricken portions of pleadings and evidence, motions to strike parts of pleadings, a multitude of objections to testimony which were overruled, numerous questions asked witnesses to which objections were sustained, and several other matters not in controversy here.

Since the record was agreed to by the parties pursuant to rule 340(h) we are not sure where the principal fault lies in failing to comply with our rule in preparing the record and therefore refrain from imposing or withholding costs because thereof as authorized by rule 340(g). However, attorneys are again urged to give attention to the plain, simple requirements of rule 340 in preparing the record on appeal.

On the merits the principal question presented here is the sufficiency of the evidence to warrant submission to the jury. Of course plaintiff is entitled to the most favorable construction of which the evidence is fairly susceptible. Bartholomew v. Butts, 232 Iowa 776, 779, 5 N.W.2d 7, 9, and citations. And see Wambold v. Brock, 236 Iowa 758, 759, 19 N.W.2d 582; Kirchner v. Dorsey & Dorsey, 226 Iowa 283, 288, 284 N.W. 171.

On May 14, 1946, plaintiff, forty-four, a carpenter, fell twelve to fourteen feet from a barn and "lit" in a sitting position. He sustained a compression fracture of the third lumbar vertebra although the injury was not correctly diagnosed until August 12, 1946, at the State University Hospital in Iowa City. Plaintiff was taken to his home at Allerton about noon on May 14. That afternoon defendant, plaintiff's family doctor for three or four years who operated a hospital at near-by Corydon, was called but declined to go to plaintiff's home. Plaintiff suffered such pain that Dr. Shook, an osteopath at Corydon who had never before treated plaintiff, was called and came to the home about ten that evening.

It was decided to take plaintiff that night in an ambulance to defendant's hospital to ascertain the extent of the injury and if there were any broken bones to take him to the State University Hospital in Iowa City, about one hundred seventy miles from Corydon. Plaintiff, his wife and Dr. Shook arrived at the

Corydon hospital about eleven p.m. Plaintiff was carried in on a stretcher.

Defendant was told all about how plaintiff had fallen, of the pain he was suffering and of the plan to take him on to Iowa City in the ambulance if there were any broken bones or anything was seriously wrong. Defendant and his assistant Dr. Buchtel examined plaintiff soon after his admission to the hospital. No injury to the spinal cord or nerves was found. Compression fractures of vertebrae often do not result in cord or nerve injury.

The next day Dr. Merrick, a dentist in the Corydon hospital who operated an X-ray machine there, presumably at defendant's request took one X-ray view of plaintiff's pelvis and fourth and fifth lumbar vertebrae. (The five lumbar vertebrae are just above the pelvis and below the dorsal vertebrae.) The X-ray film states, "Part X-Rayed—Hips." Defendant and Dr. Buchtel were present when the X-ray was taken and it is to be inferred defendant either told Dr. Merrick the region to be photographed or knew just what was done. In any event Drs. Corbin (defendant) and Buchtel placed plaintiff on the X-ray table.

Dr. Merrick does not recall that he was requested to take more than the one X-ray and says he would probably have done so if requested. The single view was from front to rear (antero-posterior) and not a lateral view which more clearly shows a compression-fractured vertebra. It was difficult to get a lateral view through the lower back on Dr. Merrick's machine without a device he did not have.

Since the X-ray picture taken in defendant's hospital showed only the fourth and fifth lumbar vertebrae of course it did not reveal the fracture in the third lumbar. Defendant told plaintiff's wife it was a perfect X-ray. On the strength of this X-ray and the observation and examination of plaintiff by Drs. Corbin and Buchtel, defendant assured plaintiff and his wife there were no broken bones and nothing was wrong with him. When plaintiff continued to suffer his wife asked defendant if they should not take plaintiff on to Iowa City and defendant replied, "Hell no. There is nothing they can do for him there that I can't."

Plaintiff stayed in defendant's hospital six days. No other

X-ray was taken and no further examination made. Although plaintiff frequently complained that his pain did not subside and was unable to sit up defendant said plaintiff could leave the hospital on May 20. He gave plaintiff or his wife no instructions for his future care. When plaintiff left no one connected with the hospital assisted him. Defendant got mad and walked away because plaintiff's wife said she was then unable to pay the hospital bill but would arrange for it.

Plaintiff "had a terrible time trying to dress." Another patient in the same room testified: "He went through rather painful maneuvers to get his clothes on. He groaned and complained of pain. When he left the room other people assisted him. Neither Dr. Corbin nor any nurse was there."

Plaintiff stayed at home from May 21 to August 12. He was in bed much of the time but in reliance on assurances from defendant there was nothing wrong with him he attempted to walk by pushing a chair before him. Dr. Shook, who did not call on plaintiff while he was in defendant's hospital, was called on May 21 and saw plaintiff about three times a week for several weeks. He prescribed sleeping pills and pain pills and urged plaintiff to go to the hospital at Iowa City.

Plaintiff was taken in an ambulance to the university hospital in Iowa City on August 12 where he was examined by or under the direction of Dr. Steindler, head of the department of orthopedic surgery there, a widely recognized authority in that field. Two X-rays were taken of part of plaintiff's spine, an anteroposterior view and a lateral view. Both plainly show a compression fracture of the third lumbar vertebra. It appears to have been smashed and made wider than normal and a small fragment is broken off. Dr. Buchtel testified the fracture is "very obvious" from the lateral X-ray taken in Iowa City.

At Iowa City plaintiff was given a body brace to wear and told to take plenty of rest. He returned to the university hospital on September 23 and October 19, 1946, and March 10 and April 26, 1947. On May 2, 1947, a "spinal fusion" operation was performed on plaintiff at Iowa City by which the second, third, fourth and fifth lumbar vertebrae were left permanently rigid, like a solid sheet, for the rest of his life.

Plaintiff remained in the university hospital four weeks

after this operation and was then at home in bed six weeks. He returned to his carpenter work in June 1948 but still suffered pain and was unable to do the work he previously did.

In this action defendant is charged with negligence in failing to discover the fracture in plaintiff's spine, in advising plaintiff he had no fracture in his spine and there was no need for further examination and treatment at the university hospital, and in failing to advise plaintiff upon his leaving the hospital of his true condition and to instruct him as to future care.

At the close of plaintiff's evidence a verdict was directed for defendant on the ground plaintiff had failed to establish: (1) by expert testimony the standard of medical care applicable to Corydon or similar communities and breach thereof (2) that the negligence charged against defendant was the proximate cause of plaintiff's damage, and (3) freedom from contributory negligence.

■ I. A physician is bound to use that degree of knowledge, skill, care, and attention ordinarily exercised by physicians under like circumstances and in like localities. He does not impliedly guarantee results. Bartholomew v. Butts, supra, 232 Iowa 776, 779, 5 N.W.2d 7, 9, and citations.

■ Of course malpractice may consist in lack of skill or care in diagnosis as well as in treatment. In re Estate of Johnson, 145 Neb. 333, 16 N.W.2d 504, 511, and citation; Kuechler v. Volgmann, 180 Wis. 238, 192 N.W. 1015, 31 A. L. R. 826, 829, and citation; 41 Am. Jur., Physicians and Surgeons, section 92.

■ A patient is entitled to a thorough and careful examination such as his condition and attending circumstances will permit, with such diligence and methods of diagnosis as are usually approved and practiced by physicians of ordinary learning, judgment and skill in the community or similar localities. A physician does not insure the correctness of his diagnosis. Ramberg v. Morgan, 209 Iowa 474, 477, 218 N.W. 492. See also In re Estate of Johnson, supra, 145 Neb. 333, 16 N.W.2d 504, 510, and citations; Hill v. Boughton, 146 Fla. 505, 1 So. 2d 610, 134 A. L. R. 678, 682; 41 Am. Jur., Physicians and Surgeons, section 92.

■ Ordinarily, evidence of the requisite skill and care exercised by a physician must come from experts. Bartholomew v.

Butts, supra, and citations. But there are exceptions to this rule. Whetstine v. Moravec, 228 Iowa 352, 370 et seq., 291 N.W. 425, and citations, especially Kopecky v. Hasek Bros., 180 Iowa 45, 49, 162 N.W. 828, 830, also cited with approval in Wambold v. Brock, 236 Iowa 758, 762, 19 N.W.2d 582, 584; Peterson v. Hunt, 197 Wash. 255, 84 P.2d 999, 1000, and citations.

It is undisputed that defendant assured plaintiff nothing was wrong with him when in fact he was suffering from a fractured vertebra. But mere proof the diagnosis was erroneous will not support a verdict for damages unless there is evidence of lack of skill or care in making the examination or forming the doctor's judgment. Edwards v. Uland, 193 Ind. 376, 140 N.E. 546, 548, and citations.

It has been repeatedly held that a physician's failure to take X-ray pictures, or have them taken, as an aid to diagnosis when X-ray machines are available and commonly used by physicians in similar cases may be actionable negligence. McBride v. Saylin, 6 Cal.2d 134, 56 P.2d 941; James v. Grigsby, 114 Kan. 627, 220 P. 267; Hoover v. McCormick, 197 Ky. 509, 247 S.W. 718; Hodgson v. Bigelow, 335 Pa. 497, 7 A.2d 338, 348; Peterson v. Hunt, supra, 197 Wash. 255, 84 P.2d 999, 1000.

Indeed use of the X-ray as an aid to diagnosis of bone injuries has been held a matter of common knowledge. Reynolds v. Struble, 128 Cal. App. 716, 18 P.2d 690; Whitson v. Hillis, 55 N.D. 797, 215 N.W. 480, 482. See also Flock v. J. C. Palumbo Fruit Co., 63 Idaho 220, 118 P.2d 707, 715.

II. Defendant contends and the trial court apparently held that no expert testified directly to the standard of medical care in Corydon and like communities and there is therefore no evidence defendant was negligent in any of the respects claimed. We think there is sufficient evidence of negligence for submission to the jury.

Dr. Steindler testified compression fractures of the spine are frequently caused by such a fall as plaintiff's and that location of the pain and history of the injury are important in indicating a compression fracture. As stated, defendant was told about the fall and the resulting pain. Defendant's assistant Dr. Buchtel (whose deposition, taken by defendant, was offered by plaintiff) said the pain of which plaintiff complained in his

lower back and hips "certainly did" create suspicion of a compression fracture and in a fall like plaintiff's compression fractures may occur in the lower dorsal or any of the lumbar vertebrae.

Dr. Buchtel further admitted X-ray pictures are helpful and a recognized test of a compression fracture, that lateral X-ray views are "certainly necessary" in diagnosing such fractures, X-ray pictures—especially lateral views—"certainly should be made when possible." This witness also said:

"I think you would want to certainly rule out compression fracture. Q. You can say whether you feel further examination should have been made before you rule out compression fracture in this particular instance? A. That is right. Q. *Don't you think it was necessary?* A. *Yes I do."*

Dr. Steindler (defendant says in argument we will probably take judicial notice the doctor possesses the highest skill in orthopedics) testified:

"We always take a lateral view if possible. Q. Do you personally consider a lateral view important in diagnosing a compression fracture? A. I do. Q. Is the necessity and importance of a lateral view *generally* recognized in the diagnosis of injuries to the spine? A. I believe *most surgeons would think so."* (The pleadings admit defendant is a surgeon.)

That one X-ray picture was taken is some evidence defendant appreciated the importance of the X-ray in making his diagnosis. Plaintiff's wife said, "They did not think it necessary to take X-rays *that first evening.* They put it off until the next morning."

No explanation is offered why only one X-ray view was taken, that of the pelvis and two lower lumbar vertebrae, although Dr. Buchtel testified, in effect, he suspected a fractured vertebra in the lower dorsal or some part of the lumbar spine. As stated, defendant told plaintiff's wife it was "a perfect X-ray." If another X-ray picture had been taken to show the third lumbar vertebra it is a fair inference it would have revealed the fracture.

The necessity and importance of a lateral X-ray view as the most positive method of diagnosis were known to Dr. Buchtel

and, according to Dr. Steindler, generally recognized by most surgeons. Yet defendant made no effort to have a lateral view taken by Dr. Merrick. Nor did he suggest plaintiff be taken to Iowa City or elsewhere for such purpose. See Wambold v. Brock, supra, 236 Iowa 758, 764, 19 N.W.2d 582, 585, and citations, especially Tvedt v. Haugen, 70 N.D. 338, 294 N.W. 183, 132 A. L. R. 379, and annotation 392. The plan, known to defendant, to take plaintiff on to Iowa City if that was desirable was abandoned upon defendant's assurance nothing could be done there that he could not do. Lateral X-rays of such patients are customarily taken at Iowa City.

Plaintiff remained in defendant's hospital about six days after defendant's diagnosis there was no broken bone and nothing wrong. During this time plaintiff continued to suffer intense pain in his back and hips of which he frequently complained to defendant and the nurses. No cause of the pain other than injury to one or more vertebrae is suggested.

The conclusion is warranted that defendant's knowledge of this continued suffering should have caused him to doubt the correctness of his diagnosis and, in the exercise of ordinary skill and care, to make further examination. Yet nothing more of consequence was done. See Van Boskirk v. Pinto, 99 Neb. 164, 155 N.W. 889, 12 N.C.C.A. 777.

See also in support of the conclusion reached in this division, in addition to the authorities heretofore cited, Bolles v. Kinton, 83 Colo. 147, 263 P. 26, 56 A. L. R. 814; Whitson v. Hillis, 55 N. D. 797, 215 N.W. 480; Kuhn v. Banker, 133 Ohio St. 304, 13 N.E.2d 242, 115 A. L. R. 292, 295.

III. The question whether defendant's negligence was the proximate cause of damage was also for the jury.

Defendant argues the evidence fails to show that plaintiff's condition, presumably at the time of trial, would have been better if he had sooner entered the hospital at Iowa City. If this were true it would not preclude recovery for suffering and loss of time caused by defendant's negligence as charged.

Defendant's assurance nothing was wrong with plaintiff and that treatment at Iowa City was unnecessary naturally induced the delay of nearly three months in obtaining proper treatment. During that time plaintiff suffered much pain and was unable

to work. The belated treatment, with its accompanying pain and inability to work, required much longer time than if the injury had been promptly diagnosed. See Weintraub v. Rosen, 7 Cir., Ill., 93 F.2d 544, 548; Tvedt v. Haugen, supra, 70 N. D. 338, 294 N.W. 183, 132 A. L. R. 379, 387.

It seems almost self-evident that delay of nearly three months in diagnosing and treating a fractured vertebra would naturally cause damage. As stated in Wambold v. Brock, supra, 236 Iowa 758, 763, 19 N.W.2d 582, 585, "In fact, it is a matter of common knowledge that bone injuries, particularly fractures, should receive prompt attention." However, there is substantial testimony, mainly from Dr. Steindler, that plaintiff's condition is permanently worse than it probably would have been if the injury had been promptly diagnosed and treated.

The treatment at Iowa City for plaintiff's injury, if it had been diagnosed soon, would be to have kept him in bed for several weeks until the pain subsided and then apply a cast or brace for about six months. The majority of such cases so treated result in a practically normal spine. Dr. Buchtel testified that if the injury had been diagnosed he would have kept him at rest until he got over his pain and then probably have sent him to a specialist for further care. Because of the delay in treatment callus formed around plaintiff's injured vertebra and he could not be treated in the way just indicated.

As stated, nearly a year after the date of injury a spinal fusion operation was performed which left most of plaintiff's lumbar spine permanently rigid. This detracted from his ability to perform heavy labor and caused him to tire more easily. As previously indicated, plaintiff was unable to work until thirteen months after the operation and at the time of trial four months later he still suffered pain in his back and was unable because of his back to work as he previously did.

While there is other evidence it is apparent from the above that substantial damage is attributable to defendant's alleged negligence. Of course the original injury, even if promptly diagnosed and treated, would naturally cause much pain, loss of time and, perhaps, some permanent stiffness. And it may be difficult to determine precisely how much of plaintiff's total damage is due to the injury and how much to defendant's negli-

gence. Indeed pain is of course incapable of exact pecuniary compensation in any case. But we think the testimony affords a substantial basis for an intelligent award of damages.

We have frequently held the issue of proximate cause is ordinarily for the jury where there is substantial evidence of a defendant's negligence. Lindquist v. Des Moines Union Ry. Co., 239 Iowa 356, 362, 371, 30 N.W.2d 120, 123, 127, and citations; Dunham v. Des Moines Ry. Co., 240 Iowa 421, 427, 35 N.W.2d 578, 582.

An annotation upon proximate cause in actions for malpractice appears in 59 A. L. R. 884.

Ramberg v. Morgan, 209 Iowa 474, 218 N.W. 492, relied on by defendant, is not in point. There the injury was a fractured skull which was as probable a cause of death as the doctor's failure to diagnose and treat the injury. The jury could only guess which cause produced death.

IV. Clearly the issue of freedom from contributory negligence was also for the jury. It is true that between plaintiff's discharge from defendant's hospital and his first trip to Iowa City he occasionally attempted, with the aid of his wife or with a chair or other furniture, to get out of bed and walk. However, it is shown he did this in reliance on defendant's assurance nothing was wrong with him and because defendant had given no instructions for his care, thereby implying that no instructions were necessary. A fair inference is plaintiff believed he was pursuing the best course in attempting to walk.

Plaintiff's failure to stay in bed constantly under the circumstances here does not amount to contributory negligence as a matter of law. Pertinent here is this from Wambold v. Brock, supra, 236 Iowa 758, 763, 19 N.W.2d 582, 584: " * * * appellee never advised appellant to wear the bandage * * * or objected to her not wearing it at any time. * * * If she needed the bandage it was a part of his duty to so advise. The failure to do something which he should have advised her to do could hardly be the basis of a claim of contributory negligence. Further, in personal injury cases, the question of contributory negligence is ordinarily for the jury."

V. One ground of defendant's motion for directed verdict is that plaintiff failed to *plead or* prove his freedom from

contributory negligence. As stated, the trial court sustained this ground only as to the claimed failure of proof on this issue. However defendant is entitled to urge here—and has urged—in support of the directed verdict plaintiff's failure to plead freedom from contributory negligence. Knaus Truck Lines v. Commercial Freight Lines, 238 Iowa 1356, 1365, 29 N.W.2d 204, 209, and citations. We think this claimed defect in plaintiff's petition under the record here did not entitle defendant to a directed verdict.

It is true we have said almost countless times that subject to certain exceptions the burden rests on a plaintiff in a negligence case to plead and prove freedom from contributory negligence. And plaintiff's petition here does not contain the usual allegation of such freedom. However it does state "he has at all times since his injury followed such instruction as he received from his doctors to the best of his knowledge and ability." Defendant did not challenge the sufficiency of the petition to allege freedom from contributory negligence except as above stated.

When a doubtful pleading is attacked by motion, demurrer or, as permitted by rule 72, R. C. P., in the answer it will be resolved against the pleader. But after issue is joined without raising any "points of law appearing on the face of the petition" (rule 72), it will be liberally construed in order to effectuate justice between the parties. The pleader will be accorded the advantage of every reasonable intendment, even to implications necessarily inferred, regardless of technical objections or informalities. Lampman v. Bruning (Ladd, J.), 120 Iowa 167, 169, 170, 94 N.W. 562, 563, and citations; Kirchner v. Dorsey & Dorsey, 226 Iowa 283, 289, 290, 284 N.W. 171. And see rule 67, R. C. P.; 41 Am. Jur., Pleading, section 67.

Until the motion to direct was made both sides proceeded as if the issue of freedom from contributory negligence were properly raised. Plaintiff offered evidence to support his claim and defendant sought to show plaintiff was negligent. Permitting the introduction of testimony on an issue not specifically pleaded obviates the necessity of its formal presentation. Where parties proceed without objection to try an issue, even though not presented by the pleadings, it amounts to consent

to try such issue and it is then rightfully in the case. Verlinden v. Godberson, 238 Iowa 161, 166, 25 N.W.2d 347, 350, and citations; Baehr-Shive Realty Co. v. Stoner-McCray System, 221 Iowa 1186, 1190, 1191, 268 N.W. 53; Andrew v. Miller, 216 Iowa 1378, 1381, 250 N.W. 711, and citations. See also 41 Am. Jur., Pleading, section 396; 49 C.J., Pleading, section 1248, pages 846, 847.

Decatur v. Simpson, 115 Iowa 348, 88 N.W. 839, 840, relied on by defendant, is quite different from the present case. There, defendant demurred to the petition because it failed to allege freedom from contributory negligence and after the demurrer was overruled answered by alleging contributory negligence. "Defendant was compelled to first introduce his evidence regarding contributory negligence, and * * * all that was required of plaintiff was to rebut this showing. Manifestly, this was to the disadvantage of the defendant." (Page 351 of 115 Iowa.)—Reversed and remanded.

All JUSTICES concur.