ONA STICKLEMAN, appellant, v. J. B. SYNHORST, M.D., et al., appellees.

No. 48012.

(Reported in 52 N.W.2d 504)

874

Leon W. Powers, of Denison, Oliver P. Bennett and John Fletcher, both of Mapleton, and James L. Bennett, of Des Moines, for appellant.

Bradshaw, Fowler, Proctor, Fairgrave & Synhorst, of Des Moines, for appellees.

GARFIELD, J.—The principal question for decision is the sufficiency of the evidence of claimed negligence of defendant Dr. Dorner in injecting oil into plaintiff's trachea. At the close of plaintiff's testimony the trial court held it was insufficient for submission to the jury. We disagree. Of course plaintiff is entitled to the most favorable construction of which the evidence is fairly susceptible. Wilson v. Corbin, 241 Iowa 593, 596, 41 N.W.2d 702, 704, and citations.

Defendant Dr. Synhorst advised plaintiff, a maiden lady, thirty-nine at time of trial, to have one of her breasts removed. As a preliminary it was decided plaintiff's lungs should be "mapped"—that is, X rayed after injecting into the trachea an opaque, oily substance which better reveals the bronchial tubes. Dr. Synhorst conferred with his associate, codefendant Dr. Dorner, regarding the lung mapping and the latter undertook to do it. Plaintiff with her mother went to a hospital on Wednesday morning, January 19, 1949, for the lung mapping.

Dr. Dorner attempted to inject the oily substance directly into the trachea with a hypodermic needle. This is a recognized method although the oil is frequently dropped through the mouth without making an opening in the wall of the trachea. When Dr. Dorner jabbed the needle into plaintiff's throat he said, "I have missed." He withdrew the needle and remarked, "Maybe I should do it the other way", but added, "I guess I will try one more." He then injected the needle into plaintiff's throat

a second time. This time Dr. Dorner hit the trachea and plaintiff felt the oil gurgle down into her lungs. Two openings in plaintiff's throat were visible.

Plaintiff went to her apartment from the hospital and immediately started to bleed profusely. Dr. Dorner was called and came to the apartment about 11:30 the same morning, saw the bleeding and said if he had known plaintiff was going to do that he would have kept her in the hospital. He advised use of an ice pack on the throat and that plaintiff lie flat on her back. The profuse bleeding continued, however, and about 7:30 that evening plaintiff was returned to the hospital by a young doctor sent to the apartment by Dr. Dorner.

About 2 p.m. Thursday Dr. Dorner and two throat specialists procured by him took plaintiff to an operating room, examined her throat and performed some kind of an operation. About 7 p.m. Thursday plaintiff was again taken to the operating room, her throat was cut open and another operation was performed by one of the same throat specialists. Plaintiff continued to bleed and about 1:30 a.m. Friday was taken to the operating room a third time where she was given a general anaesthetic and a third operation was performed by one of the throat specialists.

During this period plaintiff was given transfusions of four pints of blood. She narrowly escaped bleeding to death. The two defendants (Drs. Synhorst and Dorner) and the two throat specialists came together to see plaintiff the following Sunday and one of the specialists said, referring to himself, "It took the old plumber to stop the leak." Plaintiff remained in the hospital over two weeks and at home about three weeks. She continues to suffer considerable discomfort from her throat, and one of the operations left a scar upon it. Her expense for hospital, doctors and nurses was $632.

A doctor connected with the hospital testifies the method of injecting the oil followed by Dr. Dorner, when properly executed, is safe; the diameter of the trachea is roughly that of a man's index finger; the trachea is a semirigid tube just below the Adam's apple which most people can feel; its purpose is to permit air to pass into the lungs; there are several important arteries and veins in the neck that carry a considerable quantity of blood.

A few days after the last operation upon plaintiff, Dr. Dorner told her he had to operate on a man's lungs the next day and "I don't know whether I can perform that operation after the mess I made out of you." About the time of the last operation Dr. Dorner said to plaintiff's mother and aunt he had done the same kind of lung mapping operation hundreds of times and never had anything like this happen before. In February 1949 Dr. Dorner told plaintiff, "Of course you won't owe me anything for that lung mapping." Plaintiff replied, "For goodness sakes, I wouldn't think so after what you have done to me." To that the doctor made no response.

Defendants first argue in this court, although not strenuously, Dr. Synhorst is entitled to an affirmance in any event because it is said he is not liable for any negligence of Dr. Dorner. No such contention was made in the lower court in the motion to direct or otherwise and defendants may not raise it for the first time in this court. The ruling on the motion to direct will not be upheld here on a ground not asserted in the trial court. Gross v. Hocker, 243 Iowa 291, 296, 51 N.W.2d 466, 468, 469, and citations. We may add, however, without setting out the evidence on which our conclusion is based, a jury question is presented as to the liability of Dr. Synhorst for the claimed negligence of his codefendant.

There is ample evidence that in attempting to inject the hypodermic needle into plaintiff's trachea Dr. Dorner first missed that organ. His statement, "I have missed", clearly means he had missed the trachea. The needle, however, was injected into plaintiff's throat. The finding is warranted it was negligent for an experienced surgeon like Dr. Dorner to miss with a hypodermic needle an object of such size and obvious location as plaintiff's trachea.

As defendants say in argument, all grounds of their motion to direct raise the proposition there was insufficient evidence of negligence. We are clear such contention cannot be sustained. The motion to direct does not assert, except perhaps inferentially, the testimony was insufficient to support a finding their negligence was the proximate cause of plaintiff's injury—the excessive bleeding and its consequences. Defendants may have intended to raise that contention. In any event, we think the issue of proximate cause was also for the jury.

There is much evidence plaintiff started to bleed profusely soon after the two openings were made in her throat. As stated, there is expert testimony several important arteries and veins are in the throat and they carry a considerable quantity of blood. Indeed these are facts of common knowledge. To cut one's throat is commonly regarded as a serious injury because of the danger from loss of blood.

There is also expert evidence the method pursued by Dr. Dorner is safe when properly executed. This fairly implies when the needle does not miss the trachea. As Dr. Dorner said, he had done such a lung mapping operation hundreds of times and never had anything like this happen before. It may be inferred his needle had not missed the mark before and the fact it did in this instance is the reason plaintiff, of the hundreds of his patients whose lungs he had mapped, suffered great loss of blood.

Dr. Dorner's other statements about "the mess I made out of you" and that he would not charge for "that lung mapping", apparently agreeing with plaintiff no charge should be made, are in the nature of admissions which aid plaintiff's case. Dr. Dorner's statements here can hardly be called mere expressions of regret or sympathy. See in this connection McGulpin v. Bessmer, 241 Iowa 1119, 1126, 43 N.W.2d 121, 125, and citations.

From all the foregoing considerations reasonable minds could find Dr. Dorner punctured a blood vessel in the throat when his hypodermic needle missed the mark and this caused plaintiff's excessive bleeding.

It is sufficient if under the evidence and facts of common knowledge plaintiff's theory is reasonably probable, not merely possible, and more probable than any other theory based thereon. It is not necessary the proof be conclusive or exclude every other suggested or possible cause. Bartholomew v. Butts, 232 Iowa 776, 783, 5 N.W.2d 7, 11, and citations; Woronka v. Sewall, 320 Mass. 362, 365, 69 N.E.2d 581, 582, 583, and citations. See also annotation 13 A. L. R.2d 11, 28, on proximate cause in malpractice actions; Cable v. Fullerton Lumber Co., 242 Iowa 1076, 1082, 49 N.W.2d 530, 534, and citations (not a malpractice action).

Wilson v. Corbin, supra, 241 Iowa 593, 604, 41 N.W.2d 702, 708, an action for malpractice, states: "We have frequently held the issue of proximate cause is ordinarily for the jury where there is substantial evidence of a defendant's negligence." (Citations.)

We are cited to no case closely in point on the facts and have found none. The case is not unlike those in which a surgeon unintentionally injures part of the body in the vicinity of which an operation is performed. Evans v. Roberts, 172 Iowa 653, 154 N.W. 923, 11 N. C. C. A. 728, is a case of that kind.

We have not overlooked defendants' argument that medical testimony was necessary to show just how plaintiff was injured and that Dr. Dorner was negligent.

We are aware of no rule that the nature of an injury must be shown by medical testimony if the injury is such that it may satisfactorily be shown by other evidence. We think the nature of plaintiff's injury is sufficiently shown here. There is some medical testimony which bears on the kind of injury plaintiff received. It was unnecessary to show the precise location of the blood vessel in plaintiff's throat where "the leak", as the throat specialist called it, occurred. As we have previously held, the finding is warranted there would have been no such leak and consequent loss of blood if the hypodermic needle had not missed its mark.

On the issue of Dr. Dorner's negligence, it is true ordinarily that evidence of the requisite skill and care exercised by a physician must come from experts. But there are exceptions to this rule. Wilson v. Corbin, supra, 241 Iowa 593, 599, 600, 41 N.W.2d 702, 705, 706, and citations; annotation 141 A. L. R. 5, 12.

There is some expert evidence which aids plaintiff's claim of negligence. It is true no expert testifies directly it is not an accepted method of injecting oil into the trachea for the hypodermic needle to miss that organ and puncture the throat. However, reasonable minds could readily reach such a conclusion from the testimony given. It is not claimed the method attempted is not an accepted one but that Dr. Dorner failed to use due care in his execution of the method and thus missed the trachea. As stated, there is ample evidence the doctor mistakenly punc-

tured the throat outside the trachea. We think a jury could find, without the aid of medical testimony, that in so doing he failed to exercise ordinary care.

Two exceptions to the rule requiring expert evidence in actions of this kind are applicable here. Where a physician's lack of care is so obvious as to be within the comprehension of laymen and to require only common knowledge and experience to understand expert testimony is not necessary. Also, where a physician injures a part of the body not under treatment expert evidence is not always required. See in this connection Evans v. Roberts, supra, 172 Iowa 653, 660, 154 N.W. 923, 926, 11 N. C. C. A. 728, 736; Kopecky v. Hasek Bros., 180 Iowa 45, 49, 50, 162 N.W. 828, 830; Burris v. Titzell, 189 Iowa 1322, 1335, 1336, 177 N.W. 557, 179 N.W. 851; Whetstine v. Moravec, 228 Iowa 352, 370–373, 291 N.W. 425; annotation 141 A. L. R. 5, 12, 29.

This from Evans v. Roberts, supra, has application here: "The jury here did not have to consider whether the method of the defendant in removing the adenoids was correct or scientific, but whether the unintentional wounding of plaintiff's tongue was occasioned by lack of reasonable care on his part.. This, it would seem very clear, involves no question of science or necessarily of expert knowledge."

After due consideration of all contentions urged the judgment is—Reversed.

All JUSTICES concur.