Susan K. O'BRIEN, Administrator of the
Estate of Leona Cameron, Deceased,
Appellee,

v.

Donald R. STOVER, Appellant.

No. 20533.

United States Court of Appeals,
Eighth Circuit.

June 9, 1971.

W. David Tyler and Larry J. Cohrt, Swisher & Cohrt, Waterloo, Iowa, for appellant.

William C. Ball and John C. Beekman, Waterloo, Iowa, for appellee.

Before MATTHES, Chief Judge, GIBSON, Circuit Judge, and HENLEY, District Judge.*

GIBSON, Circuit Judge.

This is an appeal in a diversity case from the Northern District of Iowa. The plaintiff O'Brien, as administrator of her mother's estate, was awarded judgment on a jury verdict of $50,000 against the defendant Stover,[1] an oral surgeon, from which judgment the defendant appeals. The cause of action was medical malpractice. The defendant challenges the court's jurisdiction, contends no liability and complains that the verdict is excessive. We affirm.

## I. THE FACTS

Viewing the evidence in the light most favorable to the verdict, the following facts are summarized from the record. On May 10, 1967, the deceased, Leona Cameron, appeared without an appointment in the defendant's office on a referral from her regular dentist. She complained of a toothache. On investigation, it appeared that there was an abscess or infection surrounding the tooth, the lower right first molar, and Dr. Stover extracted the tooth. X-rays taken at this time revealed a partial destruction of the bone underlying this tooth. Dr. Stover's initial diagnosis was "pyorrhea—a periodontal abscess." At a second appointment on May 26, Dr. Stover observed that the tooth socket was not healing properly. On June 9, 1967, the extraction site still was not healing properly. Mrs. Cameron complained of intermittent bleeding and the tissue was friable—i.e., it bled easily. The gum tissue surrounding the extraction site, as opposed to the extraction site itself, appeared normal. Nevertheless, because the extraction was not healing properly, Dr. Stover believed something was abnormal. He ordered various tests to determine if she had any blood diseases, including leukemia, that might have been affecting her healing, which turned out to be negative. He did not order a tissue biopsy which probably would have revealed the presence of a tissue cancer, poorly differentiated epidermoid carcinoma of the oral cavity, which was the ultimate cause of her death.

From this date until August 22, Mrs. Cameron was periodically examined by Dr. Stover. The tooth next to the extraction site, the lower right second bicuspid, became loose and was extracted. The prior symptoms were still present—the extraction did not heal properly, the tissue bled easily when probed, there was intermittent spontaneous bleeding and

* Chief Judge, United States District Court, Eastern District of Arkansas, sitting by designation.

[1.] Initially other physicians and a hospital were joined as defendants in this case but the Court, the Honorable Edward J. McManus, Chief Judge, at the close of all the evidence sustained their motions for directed verdict.

The appointment papers and other records in this case designate Mrs. O'Brien as "administrator" rather than the usual "administratrix" and we have therefore used the former term in referring to her in this opinion.

additionally Mrs. Cameron generally complained of not feeling well. Further X-rays were taken and the bone destruction was clearly shown. Further blood tests and a test for bone marrow cancer were ordered. These were negative. No tissue biopsy was done. There was still no definite evidence of a tumor on the gum.

She again appeared at Dr. Stover's office August 22, complaining of bleeding. This was the first time that the bleeding had occurred spontaneously while she was in Dr. Stover's office without being probed lightly by forceps. This time Dr. Stover took a cytological smear of the affected area for pathological evaluation. Here a distinction between a cytological smear and a tissue biopsy is necessary. Both are tests done to discover a tissue cancer. A cytological smear consists of scraping cells from the surface of the affected area for microscopic examination. A tissue biopsy consists of making an incision in the affected area and taking a section of the tissue for microscopic examination. The cytological smear is not a very good diagnostic device. It is a good screening device—i.e., a good method of discovering unsuspected cancers in the general population, as is commonly done with cervical cancers in women. But where there are other symptoms leading one to suspect a cancer is present, it is not a good method of getting a definitive diagnosis because of the danger of getting a "false negative"—i.e., as compared to a tissue biopsy, a cytological smear has a much greater chance of failing to indicate a cancer which is actually present. Therefore, in order to get a definite diagnosis, a tissue biopsy should be done.

It may be noted that at this point Mrs. Cameron had been under Dr. Stover's care since May 10, that since June 9 he knew some underlying causal condition was causing her not to heal properly, that no diagnosis had been made of this continuing abnormal condition, and that she had been given no treatment to correct the condition. (The tooth extraction did not constitute treatment of the condition but merely alleviation of a symptom—another loose tooth.)

The next day, August 23, Dr. Stover met with a pathologist and a radiologist to discuss Mrs. Cameron's condition. The pathologist revealed that the cytological smear had been negative—i.e., had not revealed a cancerous condition —but that no definite conclusions could be drawn in this regard unless there was a tissue biopsy. Dr. Stover did not want to do a tissue biopsy because if the condition were osteomyelitis, an infection of the bone and surrounding soft tissue, he feared that making an incision necessary for the tissue biopsy would aggravate the infection and possibly cause it to spread. The doctors then arrived at a diagnosis of chronic osteomyelitis, and Dr. Stover prescribed an antibiotic to treat it.

During the next month, Mrs. Cameron was twice treated by Dr. Stover for serious hemorrhaging from the base of the socket, once requiring hospitalization, and was otherwise periodically examined. The antibiotic treatment was continued. On September 26, Mrs. Cameron had another office call, and at this point Dr. Stover observed what was likely a cancerous tumor on her gum. He made arrangements for her to enter the University Hospital at Iowa City, Iowa, on October 4, 1967. There she was immediately diagnosed as suffering from poorly differentiated epidermoid cancer. The remaining medical history is not material to this opinion. She underwent massive surgery, radiology treatments, etc., which were unsuccessful, and ultimately died of the cancer on August 22, 1968.

## II. JURISDICTION

The defendant challenges federal jurisdiction on the grounds that there is no bona fide diversity of citizenship between the parties, contending that the appointment of Mrs. O'Brien as administrator of the decedent's estate was solely to "manufacture" diversity of citizenship, relying on McSparran v. Weist, 402 F.2d 867 (3d Cir.1968), cert. denied, 395

U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969). *McSparran* is the leading Third Circuit case on "manufactured" diversity of citizenship, which held that where the appointment of an out-of-state personal representative is for the sole purpose of creating diverse citizenship, that is insufficient to confer federal jurisdiction under 28 U.S.C. § 1359,[2] which deprives a federal court of jurisdiction in cases where a party is "improperly or collusively made or joined." The *McSparran* rule has since been adopted in the Second, Fourth and Fifth Circuits.[3]

Our court has not specifically adopted the *McSparran* rule, although it seems consistent with the precedent in this Circuit. *See* Rogers v. Bates, 431 F.2d 16 (8th Cir.1970). However, we think it is clear here that Mrs. O'Brien's appointment was not "improper or collusive" under § 1359. Mrs. O'Brien was the deceased Leona Cameron's daughter and her sole heir. She had lived near and cared for her mother during her illness until her death. Following her mother's death, Mrs. O'Brien moved with her husband and children to Mankato, Minnesota, where they have since continuously lived. The reason for this move was that her husband accepted a job in that town, where he has since been continuously employed. The diversity here is bona fide and plaintiff's appointment as administrator was natural and logical under the circumstances. She was the real party in interest. These facts are sufficient to establish diversity jurisdiction. Janzen v. Goos, 302 F.2d 421 (8th Cir.1962).

## III. THE EVIDENCE OF NEGLIGENCE

The record in this case is voluminous, but the critical testimony with regard to Dr. Stover's conduct is found in the testimony of Dr. Charles Janda.

Essentially, plaintiff's case is as follows. Mrs. Cameron's cancer was probably present from the time she went for treatment on May 10, 1967; Dr. Stover suspected something was wrong as early as June 9, 1967, and indeed suspected some systemic ailment, possibly leukemia (cancer) at this time; a tissue biopsy performed June 9 or anytime thereafter would have revealed this cancer; had the cancer been caught at an earlier time, Mrs. Cameron's chances for survival would have been better and in any event she would have lived longer and in more comfort; and Dr. Stover was negligent in failing to diagnose the cancer by performing a tissue biopsy.

This theory was supported in all respects by the testimony of Dr. Janda, whose qualifications as a medical expert were not challenged. He testified in substance that if Dr. Stover suspected cancer on June 9 he should have done a tissue biopsy; and even if he didn't suspect cancer on June 9, he should have, as there were sufficient signs and symptoms at that time; and the failure to do the biopsy was negligent. He further testified that the failure to render any treatment to correct the underlying condition between June 9 and August 23, whether for osteomyelitis or cancer, was negligent. (Presumably had treatment of osteomyelitis been undertaken earlier, the patient's failure to respond would have been highly suggestive of the need to re-evaluate the diagnosis.)

Dr. Stover asserts two defenses on the issue of negligence. One apparently is that there was no obvious evidence of a gum tumor until until September 26. However, since there were other signs of cancer much earlier, the jury was entitled to rely on the expert testimony that a diagnosis should have been made on the basis of these symptoms. There is

---

2. 28 U.S.C. § 1359 provides as follows: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

3. *See* Lester v. McFaddon, 415 F.2d 1101 (4th Cir. 1969); O'Brien v. AVCO Corp., 425 F.2d 1030 (2d Cir. 1969).; Bass v. Texas Power & Light Co., 432 F.2d 763 (5th Cir. 1970); Green v. Hale, 433 F.2d 324 (5th Cir. 1970).

no medical testimony in the record that the absence of a visible tumor in and of itself would relieve him of negligence.

The second defense offered is that there were two schools of thought with relationship to the treatment of osteomyelitis. One is that surgery is indicated and the infected bone and surrounding tissue should be taken out as soon as possible. The other advocates a more conservative approach initially, because the surgical procedure involves a risk of spreading the infection into other sensitive areas, which could have serious, possibly even fatal, consequences. Therefore, treatment by antibiotics is initially preferred and if this is unsuccessful, then surgery is performed. Dr. Janda agreed that there were these two schools of thought. Dr. Stover testified that he belonged to the more conservative school of thought which disliked surgery initially because of the risk of spreading the infection, and that he did not do the tissue biopsy because of this fear.

There are two problems with this defense. First, the "two schools of thought" as to which procedure is proper treatment for osteomyelitis would appear to come into play only when a definitive diagnosis of osteomyelitis is made. But we are here concerned primarily with proper methods of making the initial diagnosis—i.e., distinguishing the patient's underlying condition so that proper treatment could be pursued. While Dr. Janda agreed that there was a school of thought which advocated the more conservative treatment in dealing with a known case of osteomyelitis, he did not agree that where cancer was suspected as the underlying condition, the fear of spreading infection was an adequate reason for not making a tissue biopsy in order to make a definitive diagnosis. This is because the necessity for early detection and treatment is so imperative with this highly malignant type of cancer.

Secondly, even assuming that Dr. Stover did not suspect a tissue cancer on June 9, but suspected only osteomyelitis

at this time, he did not begin treatment for this condition, and only began treatment of Mrs. Cameron for osteomyelitis on August 23, at least two and one-half months after he knew there was some underlying cause of her not healing properly. Had he begun treatment for osteomyelitis earlier, her failure to respond to this treatment would probably have led to an earlier discovery of the cancer. Dr. Janda also testified that this failure to accord treatment in this period was negligence.

It may also be noted that there is no testimony in the record, apart from Dr. Stover himself, indicating that Dr. Stover was not negligent.

 The law of Iowa is clear that malpractice may consist in lack of skill or care in diagnosis as well as in treatment. Dickinson v. Mailliard, 175 N.W. 2d 588, 590 (Iowa 1970); Wilson v. Corbin, 241 Iowa 593, 41 N.W.2d 702, 705 (1950). A patient is entitled to as thorough and careful examination as his condition warrants and attending circumstances will permit, with such diligence and methods of diagnosis as are usually approved and practiced by physicians of ordinary skill and learning under like circumstances and in like localities. Grosjean v. Spencer, 258 Iowa 685, 140 N.W.2d 139, 143 (1966); Barnes v. Bovenmyer, 255 Iowa 220, 122 N.W.2d 312, 316 (1963). And a specialist is required to exercise that degree of skill and care ordinarily used by similar specialists under similar circumstances and not merely the average skill and care of a general practitioner. Barnes v. Bovenmyer, *supra*. Evidence of a doctor's negligence must be given by experts, unless the physician's lack of care is so obvious as to be within the comprehension of the layman's common knowledge. Grosjean v. Spencer, *supra*.

Plaintiff's evidence in this case clearly met the above standards and is sufficient to support the verdict.

## IV. CAUSATION AND DAMAGES

 Dr. Stover contends that even assuming he was negligent in failing to

diagnose the cancer, there is no adequate proof this failure was the cause of any damages which Mrs. Cameron suffered, and that in any event the verdict of $50,000 is excessive. The gist of this argument is that the cancer Mrs. Cameron was suffering from is one of the most virulent types of this disease, that even had it been diagnosed June 9, there is a high probability she would not have been cured of it, that ultimately the disease would have taken the same course it did, subjecting her to the same amount of medical expense, pain, suffering, disfigurement, and ultimately death.

Plaintiff's expert witnesses testified that Mrs. Cameron's cancer was probably present on June 9 and that a tissue biopsy would have revealed it. They also testified that there is an overall 30 per cent survival rate from this type of cancer and that chance is considerably improved the earlier the cancer is discovered. They also testified that had Mrs. Cameron's cancer been treated at that time, or anytime earlier than it was, she would probably have lived longer than she did and more comfortably. Furthermore, there was evidence to the effect that the decedent's condition progressed during the time that her cancer was undiagnosed, resulting in more grave prognosis at the time it was actually diagnosed.

We think this expert testimony of causation was sufficient to present a jury question under Iowa law. In the case of Wilson v. Corbin, 241 Iowa 593, 41 N.W.2d 702 (1950), the Iowa Supreme Court considered a case in which there was evidence of a three-month delay in the diagnosis of a fractured vertebra, where the defendant doctor contended there was no proof this delay in diagnosis caused the plaintiff's damages. The Court said:

"It seems almost self-evident that delay of nearly three months in diagnosing and treating a fractured vertebra would naturally cause damage. * * * However, there is substantial testimony * * * that plaintiff's condition is permanently worse than it probably would have been if the injury had been promptly diagnosed and treated.

\* \* \* \* \* \*

"* * * Of course the original injury, even if promptly diagnosed and treated, would naturally cause much pain, loss of time, and perhaps some permanent stiffness. And it may be difficult to determine precisely how much of the plaintiff's total damage is due to the injury and how much to defendant's negligence. Indeed pain is of course incapable of exact pecuniary compensation in any case. But we think the testimony affords a substantial basis for an intelligent award of damages.

\* \* \* \* \* \*

"We have frequently held the issue of proximate cause is ordinarily for the jury where there is substantial evidence of a defendant's negligence." 41 N.W.2d at 707–708.

In an almost identical case before our court, involving a negligent one-month delay in diagnosing cancer from which the patient ultimately died, we held it was error for the trial court to take the issue of proximate cause from the jury.

"* * * [I]t is clear that Tommy died from cancer and there is evidence in the record from which it can be inferred that his life would have been saved or at least prolonged and his pain lessened had he received early treatment." Jeanes v. Milner, 428 F.2d 598, 604 (8th Cir.1970).

In that case the evidence of the chances for survival from the cancer were very similar to those in the instant case. *See also* Hicks v. United States, 368 F.2d 626, 632–633 (4th Cir.1966).

■ This brings us to the question of whether the verdict in this case was excessive. The jury returned a general verdict of $50,000. While this is somewhat high, we do not think it warrants reversal. The evidence reveals that the decedent suffered considerable pain and some unnecessary treatment during the

more than three months that her cancer went undiagnosed. During the terminal phase of her illness, she suffered extensive pain, disfigurement, general discomfort such as inability to feed herself and speak, and mental suffering; there is evidence in the record from which it might be inferred that had she received earlier treatment, much of this suffering might have been ameliorated. The late discovery of the cancer, in view of its progressive nature, also contributed to more serious and radical treatment than might otherwise have been necessary. There is the additional factor that her chances for survival, or at least living longer and more comfortably were substantially lessened by the defendant's negligence in diagnosis. As a reviewing court we have neither the duty nor the prerogative of figuring the amount of a damage award. The jury determines this factual issue, with the trial judge assuming an oversight function of passing upon inadequate or excessive verdicts. Only when an award exceeds tolerable limits do we step in to prevent "a plain injustice" or a "shocking" verdict. The verdict here is within tolerable limits and we conclude it should not be reversed on the grounds of excessiveness. It is not "monstrous"; it is not "shocking." Solomon Dehydrating Company v. Guyton, 294 F.2d 439, 447–448 (8th Cir.), cert. denied, 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961); Perry v. Bertsch, 441 F.2d 939 (8th Cir.1971).

■ There is one item of damages that warrants separate comment. The defendant predicates error in the trial court's instruction No. 20, which allowed the recovery of unnecessary medical expenses. The instruction allowed recovery for "unnecessary medical, dental and hospital expenses incurred by plaintiff as a result of defendant's negligence but such allowance, if any you make, cannot exceed $6,364.36,[4] the amount expended therefor." The defendant claims that this instruction allowed the plaintiff to recover for medical expenses which would probably have been incurred even if her disease had been diagnosed earlier.

We initially note that this item of damages was not objected to by the defendant. However, even assuming it is properly before us, we do not think it is an error that warrants reversal. Of the more than $6,000 medical expenses which were stipulated to in this case, more than $5,000 were directly attributable to unnecessary medical expenses and terminal care, both of which would clearly be assessable against the defendant. Only $1041.65 could be classed as expenses of care and treatment which probably would have been incurred in any event. The trial court's instructions only permitted the jury to assess "unnecessary" medical expenses, and in view of the fact that no objection was made to the instruction nor specific instruction requested on this item and since this is a general verdict, we will not assume that the jury awarded any expenses not attributable to the additional cost and expense incurred by reason of defendant's negligent failure to properly diagnose Mrs. Cameron's condition.

The judgment is affirmed.

---

4. The amount stipulated by the parties as medical, dental and hospital expense.