Jean BRYANT, Plaintiff,

v.

John RANKIN and William Harper,
Defendants.

Civ. No. 3–795–D.

United States District Court,
S. D. Iowa,
Davenport Division.

Aug. 11, 1971.

William Bauer, Burlington, Iowa, and Russell R. Goehl, Quincy, Ill., for plaintiff.

Robert V. P. Waterman, Davenport, Iowa, Robert H. Walker and D. B. Hendricksen, Keokuk, Iowa, for defendants.

## MEMORANDUM AND ORDER

STEPHENSON, Circuit Judge (Sitting by Assignment).

■ Plaintiff brought this malpractice action against her attending physicians and St. Joseph Hospital. She dismissed her action against the hospital during the course of the trial. The case was tried and submitted to a jury which returned a verdict in favor of the plaintiff and against the defendant physicians in the sum of $150,000. The matter is now before the Court upon the motion of each defendant for judgment notwithstanding the verdict and in the alternative for a new trial. Jurisdiction is based on diversity. Plaintiff is a citizen of Missouri and the defendants are citizens of Iowa. In determining the propriety of plaintiff's motion for directed verdict the

Court, of course, views the evidence in the light most favorable to the verdict.

Plaintiff Jean Bryant sustained a fracture of her left hip along with other injuries as a result of an automobile collision on September 10, 1965 at about 2:00 a. m. She was taken to St. Joseph's Hospital in Keokuk, Iowa, where she was first seen by defendant, Dr. William Harper, at about 5:00 a. m. Plaintiff was then 28 years of age. Dr. Harper, a general practitioner, had been her family physician about 5–6 years. He had delivered two of her children and rendered other medical service through the years. Dr. Harper examined her, administered emergency treatment, and gave instructions with reference to her case including the taking of X-rays. Plaintiff was not completely conscious. X-rays were taken that day at the hospital under supervision of Dr. Pumphrey, radiologist. The X-rays indicated, inter alia, an impacted fracture of the left femoral neck. Defendant John R. Rankin general surgeon, was consulted and an operation performed on plaintiff's left hip on September 15, 1965. Dr. Rankin performed the surgery with Dr. Harper assisting. An open reduction was performed with the insertion of a Smith-Peterson nail. X-rays following the surgery indicated a good alinement and proper reduction of the fracture. Thereafter X-rays taken at about two-week intervals appeared normal until October 26, 1965, when some detachment or deterioration of the head of the femur was noticed on the X-rays. On November 17, 1965, subsequent X-rays showed further deterioration of the bone in this area. The defendants, after consultation with the radiologists, adopted a wait and see attitude. X-rays taken on January 3, 1966 indicated further deterioration of the bone. Dr. Harper testified that at this time, after consultation with his colleagues, he notified plaintiff she might need further surgical procedure on her left hip and she indicated a desire to go to the University of Missouri Medical Center at Columbia, Missouri. Dr. Harper then made arrangements for admission at Columbia which occurred on March 8, 1966. Plaintiff testified: that during this entire period she was in constant and severe pain; that Dr. Harper told her she did not need to go to Columbia; that she was well and he was sending her home; that she was released from St. Joseph's on January 9, 1966, but had to be returned on January 13 because of her discomfort.[1] She remained at St. Joseph's until her admission at Columbia Medical Center.

Shortly after plaintiff's admission to the Columbia Medical Center it was determined that a low grade infection was present in her left hip. The nail was removed from her femur and she was placed in a spica cast with the hope that a voluntary bony fusion could then be procured. These efforts were unsuccessful and finally, in March 1967, an operation known as a Girdle Stone Procedure was performed in which the ball part of the hip joint was removed and the hip allowed to ride out of the socket. As a result of this procedure the leg was shortened and somewhat weakened. Subsequently in June 1969 an operation was performed on her left foot to correct a deformity attributable to the lengthy time her left leg was placed in a cast. Plaintiff now has a permanent disability of her left leg and hip which leaves her left leg functionally disabled from 50% to 60% of normal.

## STATUTE OF LIMITATIONS

■ Defendants contend that plaintiff did not timely file her complaint and that her action is barred by the applicable two-year statute of limitations. Plaintiff's complaint was filed herein August 9, 1968. Defendants urge that the alleged malpractice of the defendants, if any, must have occurred between September 10, 1965 and March 8, 1966 while plaintiff was under the care of defendants; further, that plaintiff in March

---

1. The Court of course, for purposes of the motion, accepts plaintiff's version of events.

1966, discovered the alleged malpractice or in the exercise of reasonable care should have discovered the wrongful act. The Court submitted this issue to the jury under appropriate instructions. There are facts in the record which support a finding that plaintiff was unaware of the nature of her injury or the cause of it until the attempted bone graft was performed at Columbia, Missouri in October 1966. Defendants' motion in this regard is therefore denied. Chrischilles v. Griswold, 260 Iowa 453, 150 N.W.2d 94, 100 (1967); Williams v. Vick Chemical Co., 279 F.Supp. 833, 836 (S.D.Iowa 1967).

## STANDARD OF CARE

■■ It is well established in Iowa that malpractice may consist of failing to bring to the service of a patient that degree of knowledge, skill, care and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances and in like localities. Sinkey v. Surgical Associates, 186 N.W.2d 658, 660 (Iowa May 5, 1971). Evidence of the requisite skill and care exercised by a physician must be given by experts unless the physician's lack of care is so obvious as to be within the comprehension of the layman's common knowledge or experience, or the physician injures a part of the body not under treatment. *Sinkey, supra* at 660; Grosjean v. Spencer, 258 Iowa 685, 140 N.W.2d 139, 143–144 (Iowa 1966).

■ Plaintiff claims defendants were negligent in failing to detect, diagnose and treat the infection in her left hip when it became apparent and in failing to follow adequately her aftercare so as to ascertain the development of the infection and to take steps to prevent or to heal such infection. In support of these claims plaintiff offered evidence to show that infection was suspected by the staff at the Columbia Medical Center upon her admission March 8, 1966, and

the same was confirmed within a few days when biopsies and cultures were taken from the site of the nail that was previously inserted and from the head of the femur. In addition, plaintiff offered the testimony of Dr. Maurice D. Schnell, orthopedic surgeon and assistant professor in the Department of Orthopedic Surgery at the University of Iowa, who testified that from an examination of the X-rays taken on October 26, 1965, at the St. Joseph's Hospital he noted a beginning erosion and fragmentation of the femoral head which was possibly due to an infection of the joint space. Dr. Schnell also indicated that the X-rays taken on November 17, 1965 showed further deterioration and that if the patient were still having an inordinate amount of pain (she so testified) "based on my own experience, I probably would have elected to explore this hip surgically." Without an aspiration or surgical exploration of the hip joint with the resultant cultures one could not ascertain whether the erosion and fragmentation of the femoral head was due to the trauma or due to an infection.[2] Neither Dr. Schnell nor anyone for the Columbia Medical Center testified that the defendant physicians violated the standard of care to be expected under similar circumstances in similar localities. It is not enough for experts from University Medical Centers to state in retrospect what might have been considered had the patient been under their care. There must be some showing by an expert of a violation of the standard of care to be expected under the circumstances. This was not done as to either defendant. It is undisputed in the record that the deterioration shown on the X-ray might be due to the injury or to infection or both. The motion for judgment notwithstanding the verdict will be granted as to each defendant because of the failure of plaintiff to establish by competent evidence the requisite standard of care alleged to have been violated.

2. Even after infection is confirmed it is impossible to determine what part of the

deterioration of bone is due to infection and what is due to the trauma.

## NEGLIGENCE

Doctor Harper was a general practitioner in the community of Keokuk for twenty years. Shortly after plaintiff's admission to the hospital he arranged for X-rays and consulted with the radiologist. He then conferred with a general surgeon, Dr. John Rankin, whose services he had utilized many times over the twenty years, including two or three surgeries a year of the type plaintiff had. Dr. Schnell was asked whether a general practitioner in Keokuk, Iowa should have sought orthopedic consultation under the circumstances. In response thereto he observed that Dr. Harper had consulted a surgeon and the radiologist of the hospital, "and based on the paucity of data indicating an infection at that time, plus no evidence from the radiology record at that time, to my knowledge, that there was an infection, I think that probably the general practitioner had felt he had adequate consultation and did not require it at that time." He did venture the opinion that with constant complaints of pain " * * it might have been wise to have obtained orthopedic consultation."

■■ Doctor Harper, of course, being a general practitioner, was bound to bring to the service of his patient and apply to the case that degree of knowledge, skill, care and attention ordinarily possessed and exercised by general practitioners under like circumstances and in like localities. The Court is satisfied that plaintiff has failed to establish by any competent evidence that defendant Harper violated this standard.

■ Dr. John Rankin being a surgeon who undertook orthopedic surgery, was required to exercise that degree of skill and care ordinarily used by similar specialists in like circumstances, having regard to the existing state of knowledge in medicine and surgery, not merely the average skill and care of a general practitioner. He had been a general surgeon on Keokuk, Iowa, since 1933 except for service in World War II. He had kept abreast of current developments in his field of general surgery by attending frequent post graduate courses including one in orthopedic surgery in 1964 at the University of Iowa Orthopedic Department. He had been Chief of Surgery at both Keokuk hospitals. He had performed around 175 hip fracture operations. He had encountered two main types of complications in this type of surgery: non-union failure of the fracture to heal in the neck of the femur and avascular necrosis [3] of the head of the femur. He noted that "the University of Iowa figures are that 33% of these femoral neck fractures will develop enough avascular necrosis to require further surgery. This was generally corroborated by Dr. Schnell.

■ Dr. Rankin in November 1965, after consultation with Dr. Harper and the radiologist, favored conservative treatment. He felt that with plaintiff's comparative youth it was better not to consider further surgery without awaiting possible regeneration of the area of deterioration. He did not suspect infection. None of the usual signs of infection such as temperature elevation or signs of infection about the wound site were present. As it turned out a low grade infection was found to be present which does not produce these systems. A small amount of bone regeneration was indicated by the X-rays taken February 10, 1966. If Dr. Rankin erred it was an error of judgment for which there is no recovery allowed. A physician does not guarantee results. He can only be held responsible if negligence is shown.

---

3. Doctor Rankin defined this term as being synonymous with "aseptic necrosis," (non-infectious) loss of blood supply to an area of bone causing death of bone. Dr. Schnell testified "avascular necrosis" could result from infection or trauma or both.

The Court is satisfied that plaintiff failed to establish negligence on the part of either defendant. The motion for judgment notwithstanding the verdict as to each defendant will be granted on this ground also.

## PROXIMATE CAUSE

The matter of proximate cause is most often a jury issue and if there is any basis whatsoever for inferring the requisite causation the findings of the jury will not be disturbed. In this case the Court is convinced that plaintiff has utterly failed to establish that her present condition is due to defendants' diagnosis or treatment or aftercare. When the infection was confirmed at Columbia, Missouri in March 1966, no special steps were taken to eradicate the infection. Both of her expert witnesses, Dr. Litton from the Columbia Medical Center and Dr. Schnell from the University of Iowa, testified that if the operation performed at the Columbia Medical Center in March 1966 had been performed in January 1966 or December 1965 the results would probably have been no different. See, Barnes v. Bovenmyer, 255 Iowa 220, 122 N.W.2d 312 (1963); Cf. O'Brien v. Stover, 443 F.2d 1013 (8th Cir. 1971). Unfortunately, plaintiff's injury fell in that category of hip fractures that require further surgical treatment. Defendants' motions for judgment notwithstanding the verdict are granted as to each defendant on account of plaintiff's failure to establish that her present condition was proximately caused by the diagnosis or treatment or aftercare of the plaintiff.

## MOTION FOR NEW TRIAL

Pursuant to Rule 50(c) Federal Rules of Civil Procedure, the Court now considers defendants' alternative motion for new trial. It is the view of the Court that should the order for judgment notwithstanding the verdict herein be set aside that a new trial should be granted. The verdict is against the weight of the evidence. A new trial is therefore conditionally granted.