Mary Katherine WALDEN, individually and for the use and benefit of the minor children of her deceased husband, Harold William Walden, Plaintiff,

v.

UNITED STATES STEEL CORPORATION, Defendant.

No. CV 81–AR–1806–S.

United States District Court, N.D. Alabama, S.D.

July 25, 1983.

William C. Knight, Jr., Gary M. London, Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., for U.S. Steel.

John T. Roach, Jr., Birmingham, Ala., for plaintiff.

## MEMORANDUM OPINION

ACKER, District Judge.

On April 6, 1983, a jury verdict in the sum of $2,000,000.00 was rendered against defendant United States Steel Corporation (U.S. Steel) and in favor of plaintiff, Mary Katherine Walden, as personal representative of the Estate of her deceased husband, Harold William Walden (Walden). Previously plaintiff had received $132,500.00 by *pro tanto* settlement with another defendant, United States Fidelity & Guaranty Company. The complaint, which was never amended, sought exactly $2,000,000.00 in damages, meaning that if plaintiff should collect her present $2,000,000.00 judgment against U.S. Steel she will receive a total of $2,132,500.00, or $132,500.00 more than she sued for.

U.S. Steel has filed a motion for judgment notwithstanding the verdict, and, in the alternative, for a new trial.

The complaint, as it went to the jury, contained several counts or theories of liability. The Court will not discuss the counts, or theories, which were not submitted to the jury. The three theories which were submitted to the jury were: (1) U.S. Steel's alleged negligence in furnishing faulty designs, plans and specifications for the construction of a mine shaft in which Walden was killed; (2) U.S. Steel's alleged negligence in failing reasonably to inspect the equipment and apparatus being used where Walden was killed, after having voluntarily undertaken to do so; and (3) U.S. Steel's alleged negligent failure to warn of dangers and negligent failure to provide a reasonably safe place for Walden to work in a situation where Walden was working as an employee of an independent contractor, but on property owned by U.S. Steel and in an activity alleged to be necessarily, intrinsically and inherently dangerous and thus allegedly carrying a continuing duty on the premises' owner to persons situated as Walden was.

The basic and undisputed facts must be stated. On April 8, 1974, Walden was an employee of Cowin & Company (Cowin), working at the bottom of a vertical mine shaft which Cowin was sinking under a contract with U.S. Steel on U.S. Steel's property in Oak Grove, Jefferson County, Alabama. Cowin was an independent contractor. However, Cowin did not prepare the plans and specifications for the job. As stated in the "Agreed Summary" contained in the pre-trial order, "U.S. Steel prepared and furnished the plans and specifications for the construction of said mine." Thus, U.S. Steel concedes that it had the responsibility for producing a reasonably safe design and a reasonably safe set of engineering plans. In the Court's opinion this included some responsibility for the proposed methodology to be employed by Cowin in accomplishing the task. It was U.S. Steel, the owner, and not Cowin, which was required to furnish to the appropriate federal authorities the plans and specifications for the job, including methodology. U.S. Steel did so, adopting as its own any methodology prepared by or suggested by Cowin.

After Cowin hit the seam of coal at approximately 1,000 feet below the surface on approximately December 15, 1973, long before the accident took place on April 8, 1974, U.S. Steel, at least in some sense, became the "operator" of the mine, as contemplated by 30 C.F.R. § 75.1720–1, even though the initial extraction of coal was being performed at the time of the accident

by Cowin as part of its construction contract. Under the federal and state coal mining safety laws it is difficult, if not impossible, for an owner of a mine to insulate itself completely from liability to third persons by the expedient of hiring an intervening "independent contractor" to perform all mineral extraction. Thus, although the Court has found that Cowin was an independent contractor at the time of the accident, and while the Court does not base its present reasoning on any different finding, the fact that coal itself was being mined at the time of the accident arguably creates a slightly different relationship between U.S. Steel and Walden than existed prior to U.S. Steel's coal being taken out.

At the time of his death Walden was operating a machine for loading coal and muck. According to the design of the machine and the design of the area at the bottom of the shaft, it was impossible for Walden to load a bucket without exposing himself within the mine shaft itself. The operation was a two-bucket operation, a fact well known to U.S. Steel. While Walden was filling one bucket at the bottom of the shaft the other bucket was being hauled to the surface for emptying. In other words, in order to fill a bucket Walden had to work directly beneath another bucket. The material being extracted was loosened by the use of explosives. U.S. Steel's superintendent on the job, John Allen, who was regularly present during the entire construction project, became quite familiar with the procedures employed by Cowin. These procedures were entirely consistent with U.S. Steel's plans and specifications. For instance, Mr. Allen was familiar with the fact that Cowin workers at the bottom of the shaft necessarily loaded buckets from a position in the shaft where they were directly beneath a bucket of "muck" being raised to the surface for disposal. Mr. Allen himself viewed the hoisting equipment which was controlled from the surface, and was familiar with the dial indicator, and with the fact that there was no automatic braking device to prevent a free fall of the bucket. A mining safety regulation then applicable, 30 C.F.R. § 75.1726(b), provides:

> No work shall be performed under machinery or equipment that has been raised until such machinery or equipment has been securely blocked in position.

Mr. Allen was familiar with the fact that the muck bucket and wire rope which raised it were here not "securely blocked in position" while work was being performed beneath them. The Court finds that these items constituted "machinery and equipment" within the meaning and intent of § 75.1726(b). Title 26, § 104, Code of Alabama (1940), an Alabama law applicable at the time of this accident, contains the following pertinent provision:

> Persons engaged in deepening a shaft in which hoisting from an upper level is going on shall be protected from the danger of falling material by a suitable covering extending over the whole area of the shaft, sufficient openings being left in the covering for the passage of men or a bucket or other conveyance used in the sinking operations.

Mining Circular 53 of the United States Bureau of Mines, as revised January 1955, contains the following recommendation at page 23:

> The following safe practices should be regarded as a minimum standard in those states which do not have more stringent regulations and laws. * * * Vertical-shaft bulkheads should be provided with the heavy trap door over the opening for the sinking bucket. The door should be closed when the bucket is above it.

In the instant case there was no such bulkhead or trap door provided in the plans and specifications, or actually in use at the time of the accident. The evidence as to whether or not such a bulkhead or trap door would have prevented this accident presents a classic jury question. It was arguable.

As far as any undertaking to "inspect," Mr. Allen, as indicated, did inspect the measuring device which was supposed to alert

the lift operator of the proximity of the bucket to the surface, and Mr. Allen was familiar with the hoisting method. Before the accident while at the bottom of the shaft Mr. Allen noticed a misplacement of the air curtain, and voluntarily undertook to notify Cowin of the problem to and obtain a correction. While this change in the air curtain placement may have tended to protect Mr. Allen on future inspections, it also tended to protect Walden and other Cowin employees who were present in the shaft much more often than Mr. Allen was.

As to the issue of whether the danger was inherent or was not inherent in this particular operation, the evidence was that a short period of time before accident another person had been killed in a nearby U.S. Steel mine shaft by a falling bucket, and U.S. Steel was aware of it. John Cowin, President of Cowin, testified from admitted experience that mine shaft construction is a very dangerous undertaking. The evidence from an official publication was that of all fatal mine accidents in the United States, 17.2% have occurred during hoisting and haulage. As a matter of common sense, the Court knows that a much larger portion of work time in mines is spent in the actual extraction or digging of the mineral than in the hoisting of or the haulage of it, meaning, of course, that the most dangerous aspect is the hoisting and haulage.

At the moment of the accident the operator of the hoist, for some unexplained reason, failed to halt the full muck bucket, which hit the bull wheel on the head frame, broke loose from the cable, fell back down the shaft approximately 1,100 feet, and killed Walden.

U.S. Steel's motion for directed verdict was in most respects general in nature. It did not separately address the different counts or theories of the complaint. Even with the liberality allowed by Rule 50(a) F.R.Civ.P., it is necessary that a motion for directed verdict "shall state the specific grounds therefor." The Court finds no cases which interpret this language to require that a defendant, specifically and separately, address his motion to each of plaintiff's counts or theories of liability, although the language is certainly susceptible to such an interpretation. Logically, a motion addressed to the complaint as a whole, and which simply requests a directed verdict, if the plaintiff has fully met his burden of proof as to a single count, would not be due to be granted. Here U.S. Steel's motion for directed verdict was addressed to the complaint as a whole, and not to its separate and several counts.

Perhaps the nearest thing to an appellate expression on this question is found in *Pstragowski v. Metropolitan Life Ins. Co.,* 553 F.2d 1 (1st Cir.1977) at p. 3, as follows:

> It is, of course, established that the sufficiency of the evidence is not reviewable on appeal unless a motion for a directed verdict was made in the trial court. *See LaForest v. Autoridad de las Fuentes Fluviales,* 536 F.2d 443 (1st Cir.1975); 9 Wright & Miller, Federal Practice and Procedure § 2536. A corollary to this rule is that a party who moved for a directed verdict may obtain appellate review only on the specific ground stated in the motion. *See House of Koscot Dev. Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64 (5th Cir.1972); *Randolph v. Employers Mut. Liab. Ins. Co.,* 260 F.2d 461 (8th Cir.1958); *Friedman v. Decatur Corp.,* 77 U.S.App.D.C. 326, 135 F.2d 812 (1943). While a party need not state a contention with technical precision in order to save his rights, *he must state with "sufficient certainty to apprise the [district] court of the movant's position."* 9 Wright & Miller, Federal Practice and Procedure, § 2533, p. 580 (emphasis supplied).

The purpose of Rule 50(a) appears in *Eisenberg v. Smith,* 263 F.2d 827 (3rd Cir.1959), at p. 829, as follows:

> The purpose of the rule requiring the stating of grounds is, of course, to let the trial judge and opposing counsel see what

the problem is so that the decision will be the best that can be had. 5 Moore, Federal Practice, ¶ 50.04 p. 2321 (2d Ed.1951). How can a trial judge know what a defendant thinks the problems are if the defendant does not address each count of the complaint separately and focus on each count specifically? Such is not calculated to obtain the "best decision that can be had."

Speaking later on the same subject the Third Circuit in *Budge Manufacturing Co. v. United States,* 280 F.2d 414 (3rd Cir. 1960), at p. 415, said:

> ... adherence to its directive [Rule 50(a)] is mandatory.

Another case which elucidates this issue is *Stickleman v. Synhorst,* 243 Iowa 872, 52 N.W.2d 504 (1952). Iowa's basic requisites for a motion for directed verdict are the same as those in F.R.Civ.P. The Iowa Court was not impressed with a motion which contained generalized grounds and which was not pointed to particular aspects of the complaint. The simple assertion in *Stickleman*'s motion for directed verdict that there was insufficient evidence of negligence was not found by the Iowa Court sufficient to present seriously all of issues which *Stickleman* later conceived of only after the jury verdict.

In the instant case U.S. Steel's motion, which was filed at the close of plaintiff's evidence and was refiled at the close of all the evidence, contained 17 grounds. Not one of these grounds asserted a failure of proof as to plaintiff's theory that the activity surrounding her husband at the time of his death was necessarily, intrinsically or inherently dangerous. Not one of these grounds asserted a failure of proof as to U.S. Steel's negligent failure to conduct any and all safety inspections which it had voluntarily undertaken. Ground numbered 14 limited itself to a challenge of the duty owing to Walden to inspect the *hoisting mechanism.* It did not address any other parts of the operation. Grounds numbered 15 and 16 did assert a failure of proof that the design contributed to Walden's death.

The other grounds were general in nature, such as those asserting Walden's contributory negligence. This Court doubts that U.S. Steel's motion for directed verdict meets the requirements of Rule 50(a), except, perhaps, as addressed to plaintiff's theory of negligent design.

Nevertheless, assuming arguendo that U.S. Steel's motion passes the specificity test of Rule 50(a) and was adequate to alert the Court and plaintiff as to the contentions which U.S. Steel now makes on motion for judgment n.o.v. and for a new trial, and can be construed to claim that plaintiff failed to meet her burden under each of her separate and several theories, the law clearly required the Court, while considering U.S. Steel's motion for directed verdict (and still requires the Court while considering U.S. Steel's post-trial motions), to give plaintiff the benefit of every doubt as the Court evaluates the evidence.

As recently as June 30, 1983, the Eleventh Circuit in *Neff v. Kehoe,* 708 F.2d 638 (11 Cir.1983), reiterated the principle of law here applicable, thusly:

> Because a directed verdict decides contested substantive issues as matters of law, the same standard of review is applied by this court as by the district court. *J & H Auto Trim Co. v. Bellefonte Insurance Co.,* 677 F.2d 1365, 1368 (11th Cir. 1982). In determining whether a party's evidence is sufficient to withstand a directed verdict motion, the court must apply the principles articulated in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969), made binding on this court in *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc). Courts view all the evidence, together with all logical inferences flowing from the evidence, in the light most favorable to the non-moving party:
>
> > On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in

the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonably and fairminded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing* 411 F.2d at 374–375. *Accord Kaye v. Pawnee Construction Co.,* 680 F.2d 1360, 1364 (11th Cir.1982); *Maxey v. Freightliner Corp.,* 665 F.2d 1367, 1371 (5th Cir.1982) (en banc). Applying the *Boeing* standard to the present case, we reverse the directed verdict on both the fraud claim and the breach of warranty claim.

Using the *Boeing* rule as its guide the Court now examines each of plaintiff's three theories of liability in order to ascertain whether or not there was substantial evidence to support it.

### The Theory of Faulty Design

■ Plaintiff offered an impressive expert witness, Walter Wickstrom, a mining engineer of long experience. Mr. Wickstrom criticized U.S. Steel's plans and specifications and stated his opinion that in several respects they did not meet the current standards of reasonable safety and that they contributed to causing the accident. There is no point in detailing Mr. Wickstrom's testimony. Suffice it to say that U.S. Steel did not offer a rebuttal expert witness, leaving Mr. Wickstrom's expert conclusions virtually unchallenged.

Not only were the plans and specifications those of U.S. Steel, but even after Cowin had reached the seam of coal, U.S. Steel, on a day-by-day basis, was involved in "planning." At p. 19 of Mr. Allen's deposition, which was introduced into evidence, Mr. Allen testified:

Then you have got to decide what your mining activities will be; which way you are—what you are going to do first, where you are going to mine to, how will you—you are cramped for space. You're going to make a cut and get coal out. Then you have got to find out some place to put the mining machine while you run a roof bolter in there to get that started. All of this is—I know it sounds rather strange, but it's a little bit trickier than it might seem like * * *

So that during that period of time [after hitting the seam] *we were involved in planning in some detail almost ton by ton what would happen in what we call initial mining operations.* This was to connect the shaft and slopes together (emphasis supplied).

The jury could have easily translated this testimony into an admission of continuing negligent design when the mining machine and its operator obviously were exposed in the shaft because of the configuration of the machine and of the space.

Another example of arguably faulty design was the absence of any provision in the plans for a bulkhead to close off the shaft while the bucket was above it. Whether or not such a bulkhead was reasonably necessary was a question for the jury. It was not in the plans.

## The Theory of Negligent Failure to Inspect

█ In denying liability for negligent failure to inspect U.S. Steel relies primarily on *Pate v. U.S. Steel*, 393 So.2d 992 (Ala. 1981), and on *Columbia Engineering International v. Espey*, 17 ABR 1005 (1983). Neither of these cases deals with a situation in which there had actually been a voluntary inspection conducted. Instead, in these cases there was no evidence whatsoever of a voluntary undertaking. Thus, the issue in those cases was whether or not an inspection *should* have taken place, not whether an inspection, once voluntarily undertaken, *had been properly done*. In *Pate* the Supreme Court of Alabama said at 393 So.2d 996:

> By their own concession, appellants are barred from recovery on this theory; they recognized the trial court's findings that U.S.S. made no safety inspections of the work site. Without an undertaking to inspect, no duty arises. The trial court properly acknowledged this in its granting of directed verdict to U.S.S.
>
> However, appellants argue on appeal that U.S.S. was negligent in the failure to inspect for safety in the first place. No authority is cited for this unique proposition.

In the instant case plaintiff has never asserted the unique proposition which was rejected by the Alabama Court in *Pate*.

The writer of this opinion is as familiar with *Beasley v. MacDonald Engineering Co.*, 287 Ala. 189, 249 So.2d 844 (1971), as is any person, except perhaps, the justices of the Supreme Court of Alabama who wrote the opinion. The writer was the lawyer who argued the case. *Beasley,* simply put, requires that a purely voluntary safety inspector perform as a reasonably prudent man once he has undertaken the inspection. U.S. Steel here says that its superintendent on the job, Mr. Allen, did not intend to undertake anything for the benefit of, or for the protection of, Cowin's employees, but rather he was looking out exclusively for himself and for the interests of U.S. Steel. This argument is identical to the argument which Liberty Mutual Insurance Company made in *Beasley*. Liberty Mutual there denied any intent to benefit or to protect the employees of Alpha Portland Cement. The Alabama Court rejected the argument. Liberty Mutual also argued that it undertook only a partial inspection and did not undertake to inspect the particular piece of equipment which was alleged to be faulty. This is also one of U.S. Steel's arguments. The Alabama Court, in effect, said that an inspector cannot wear blinders once he becomes an inspector. "Inspection" contemplates "inspection." In the instant case Mr. Allen not only regularly viewed the apparatus at the top of the shaft, including the indicator, but he actually entered the shaft, saw the methods and the machinery being employed by Cowin, and even undertook to criticize the air curtain placement. If he had done nothing whatsoever in the way of checking on any safety feature, U.S. Steel would not have exposed itself to the law of *Beasley,* but once Mr. Allen undertook to do things which the jury could reasonably construe to constitute safety inspections, he thereupon subjected U.S. Steel, on a *respondeat superior* theory, to liability in the event the jury should determine that he did not act as a reasonably prudent man under the circumstances. It was as difficult for U.S. Steel to argue before the jury as it is for U.S. Steel to argue to the Court as a matter of law, that a mining engineer with Mr. Allen's experience, in an exercise of reasonable judgment, would not have comprehended the highly dangerous aspects of the "two bucket" operation under all of the circumstances and would not have suggested corrective measures.

While U.S. Steel can certainly point to evidence upon which the jury could have found no undertaking by U.S. Steel to inspect for safety, and/or no negligence in performing such inspection, and/or no causal connection between any negligent inspection and the accident, there was ample evi-

dence to the contrary on each of these liability elements, and therefore, the *Boeing* rule requires a denial of U.S. Steel's post-trial motion as addressed to plaintiff's theory of negligent inspection.

### The Alleged Non-delegable Duty When An Activity Is Intrinsically Dangerous

It may have been more comfortable for the Court if it had certified this question of state law to the Alabama Court. However, at the time it overruled U.S. Steel's motion for directed verdict, the Court was confident, and the Court is now confident, that the applicable principles of Alabama law are not so mirky as to require an interruption of the federal judicial process in order to obtain an unequivocal expression from the Alabama Court on the question of how to deal with the "inherently dangerous" exception to the general rule which places no duty on a property owner to the employees of an independent contractor where the owner maintains no control. Of course, if the Eleventh Circuit should disagree with the Court, and should feel that the Alabama law is unclear, the Eleventh Circuit can certify this question to the Alabama Court more easily than can this Court, and the Alabama Court may be more likely to respond.

After the Court had completed its oral charge to the jury, counsel for U.S. Steel, while taking his exceptions, said:

One other ground to our exception to the intrinsic, inherently intrinsically dangerous situation is that *it is not a factual issue, but rather a legal issue,* Your Honor (emphasis supplied).

U.S. Steel, both then and now, takes the position that the activity surrounding Walden was, as a matter of law, not "necessarily, intrinsically or inherently dangerous" as that phrase is used in the Alabama cases recognizing a non-delegable duty by a landowner.

As the Court has stated, and as it charged the jury in this case, a landowner ordinarily owes no duty to an independent contractor's employees. However, the exception here being discussed occurs where the activity is "inherently or intrinsically dangerous." *Knight v. Burns, Kirkley & Williams Const. Co.,* 331 So.2d 651 (Ala.1976); and *Burroughs v. Joiner,* 337 So.2d 340 (Ala.1976). The Court submitted this question of fact to the jury with an instruction which included the following:

The owner may be liable for injury to a third person such as an employed on the job where the work is of such kind or class that the doing of it, however carefully or skillfully performed, is necessarily and intrinsically dangerous.

U.S. Steel cites several cases in which an Alabama Court has found that, as a matter of law, a particular activity is not "necessarily or intrinsically dangerous." One of these cases is a construction case. Another is a mining case. Conspicuously, none of U.S. Steel's cases is a *mining construction* case. More particularly, none of these decisions involves working in a mine under a hoist. Nowhere has the Supreme Court of Alabama ever said that work being performed 1,110 feet directly underneath a muck bucket which has no automatic braking device, and with no bulkhead, and with blasting going on, is not "necessarily or intrinsically dangerous." Based on the testimony of Mr. Wickstrom and of Mr. Cowin, if the Court were required to decide, as a matter of law, whether or not this particular activity was "necessarily and intrinsically dangerous," this Court would decide that the said activity is "necessarily and intrinsically dangerous." To do otherwise would, in the Court's opinion, do irreparable harm to this particular exception to the limitation of the liability of the landowner to employees of an independent contractor. It might even take away all meaning from the exception.

The words "inherently dangerous" have been defined in *Majestic Realty Association, Inc. v. Toti Contracting Co.,* 30 N.J. 425, 153 A.2d 321 (1959). The Supreme Court of

New Jersey there dealt with this very exception. That court recognized that where a landowner engages a contractor, the landowner is not ordinarily liable for the negligent acts of the contractor, but the court also readily recognized an exception where the contractor is called upon to do inherently dangerous work. In the particular case the tort claim was being made against a public parking authority as a result of its independent contractor's demolishing of structures using a large metal ball suspended from a crane. The New Jersey Court said that whether this activity was "inherently dangerous" was a jury question. The court said at 153 A.2d 327:

There is no doubt that the line between work which is ordinary, usual and commonplace, and that which is inherently dangerous because its very nature involves a peculiar and high risk of harm to members of the public or adjoining proprietors of land unless special precautions are taken, is somewhat shadowy. At least one basis for classification must stem from a common realization by reasonable men that a higher incidence of accidents is ordinarily associated with the latter type of work. The perimeter of an all-inclusive category cannot be drawn except in the general terms of the rule, and its application must be left in large measure to the gradual accumulation of precedents.

\*    \*    \*    \*    \*    \*

In our judgment, the doctrine adopted by New York and the other jurisdictions cited represents the sound and just concept to be applied. And within the broad outlines thereof, where the minds of reasonable men might differ as to whether the activity contracted for by the landowner is inherently dangerous or involves a peculiar risk of harm to others unless special precautions are taken, the issue is for jury determination.

In *Clark v. City of Chicago,* 88 Ill.App.3d 760, 43 Ill.Dec. 892, 410 N.E.2d 1025 (1980), the Appellate Court of Illinois held that the demolition of a five-story building was "inherently dangerous activity," as a matter of law. If demolition is "inherently dangerous" then, in this Court's opinion, the activity in which Walden was engaged was likewise "inherently dangerous."

The exception here is restated in Restatement (Second) of Torts § 427, as follows:

One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

This Restatement expression was commented upon by the Supreme Court of Colorado in *Western Stock Center, Inc. v. Sevit, Inc.,* 195 Colo. 372, 578 P.2d 1045 (1978), at p. 1050, as follows:

A difficult question is what constitutes an "inherently dangerous" activity. The authors of the Second Restatement comment that: "The rule applies equally to work which, although not highly dangerous, involves a risk recognizable in advance that danger inherent in the work itself, or in the ordinary or prescribed way of doing it, may cause harm to others." Restatement (Second) of Torts § 427 (Comment c). Thus, an inherently dangerous activity need not be extremely or even highly dangerous but must only present a foreseeable and significant risk of harm to others if not carefully carried out. The determination of what constitutes an inherently dangerous activity *should be made by the trier of fact,* which is in the best position to evaluate the inherent danger of the work in different circumstances. *Accord, Schultz v. Lindsay Construction Co. v. Erickson,* 352 F.2d 425 (8th Cir.).[4]

---

[4] One court has appropriately commented that: "Work not inherently dangerous under

some circumstances may be inherently dangerous under other circumstances. Thus, construction work near a street or sidewalk may, by reason of proximity to the street or sidewalk, be inherently dangerous." *Fegles Construction Co. v. McLaughlin Construction Co.,* 205 F.2d 637 (9th Cir.).

(emphasis supplied.)

■ From these decisions this Court concludes that it would not have committed error if it had instructed the jury that the activity in which Walden was engaged at the time of the accident was, in fact and law, "inherently dangerous." Instead, the Court submitted the issue to the jury, using Alabama Pattern Jury Instructions, §§ 31.-91 and 31.92 as guides. The jury, on substantial evidence, could certainly have decided that this particular activity was "inherently dangerous". Therefore, the jury could have found for plaintiff and against defendant on this particular one of plaintiff's three theories.

Of course, no one knows or can know which of plaintiff's three theories the jury actually used in arriving at its verdict. It may have used only one. It may have used two. It may have used three.

### The Jury Charge

U.S. Steel's exceptions to the Court's oral charge to the jury cover the same ground which has been covered. The Court finds that U.S. Steel's exceptions to the jury charge are without merit.

### The Size of the Verdict

If Alabama's Homicide Act permitted the recovery of compensatory damages, it would be easier for the Court to evaluate the size of this verdict. As it stands, the only measure of damages for wrongful death in Alabama is: "What does it take adequately to punish the tort-feasor considering the extent and quality of the wrong committed?"

■ As plaintiff evaluated her own case against U.S. Steel and U.S.F. & G. when she filed suit, she placed on it a value of $2,000,000.00. Nevertheless, the Court recognizes that neither a plaintiff nor a trier of the fact is limited by the *ad damnum* in the complaint. Nevertheless, the amount claimed is not without significance.

■ In *Sinclair Refining Company v. Howell,* 222 F.2d 637 (5th Cir.1955), the Fifth Circuit said at p. 641:

As the wording of the statute [Alabama Homicide Act] indicates, the amount rests largely in the sound discretion of the jury. The damages are entirely punitive, imposed for the preservation of human life, and measured by reference to the quality of the wrongful act and the degree of culpability. *Richmond & D.R. Co. v. Freeman,* 97 Ala. 289, 11 So. 800, 801. *The $30,000 verdict in this case is more than has ordinarily been approved by the Alabama Supreme Court even for wanton misconduct* (emphasis supplied).

While jury verdicts for wrongful death in Alabama have come a long way since 1955, there is still room for comparison in death verdicts. This Court has examined numerous recent death verdicts and settlements in Alabama. A verdict of $1,250,000 would be in the upper range. While respecting the jury's prerogative, the Court nevertheless must, to some degree, consider the degree of culpability of U.S. Steel. After due deliberation, the Court determines that the jury verdict should be reduced to the sum of $1,250,000.00, it being understood, of course, that this does not affect plaintiff's *pro tanto* settlement with U.S.F. & G.

In *Lowe v. General Motors Corp.,* 624 F.2d 1373 (5th Cir.1980), the Fifth Circuit at p. 1383 reminded this very Court that when it exercises its discretion under Alabama law to reduce or set aside a verdict as excessive, there is "always lurking . . . the Seventh Amendment guarantee of a jury trial." The Court has endeavored to apply the standard set forth in *Lowe* and also to respect the Seventh Amendment.

An order of remittitur will be entered separately, together with an order overrul-

ing U.S. Steel's motion for judgment n.o.v., and continuing U.S. Steel's motion for a new trial depending upon whether or not there is a remittitur.